Louis H. Miron
*Attorney at Law*
123 North Union Avenue
Suite 103
Cranford, New Jersey 07016
(908) 233-9555
LM-9910


John R. Cahill (to be admitted *pro hac vice*)
Jonathan A. Olsoff (to be admitted *pro hac vice*)
OLSOFF | CAHILL | COSSU LLP
110 West 40th Street (901)
New York, New York 10018
(212) 719-4400

*Attorneys for Plaintiff*
*August Uribe Fine Art, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AUGUST URIBE FINE ART, LLC,** | **CIVIL NO. _____** |
| *Plaintiff,* | **COMPLAINT** |
| - against - | **JURY TRIAL DEMANDED** |
| **DARTMILANO SRL, PIER GIULIO LANZA, RICCARDO MANFRIN, MARIA STELLINA MARESCALCHI, FRACASSI WORLDWIDE SHIPPING SRL, OBLYON GROUP, LLC, and ART LENDING, INC,** | |
| *Defendants,* | |
| - and - | |
| **A CERTAIN ARTWORK,** | |
| *Defendant-in-rem.* | |

Plaintiff August Uribe Fine Art, LLC ("UFA" or "Plaintiff" or "Seller"), by and through

its attorneys , Olsoff | Cahill | Cossu LLP against DARTMILANO SRL ("DART"), Pier Giulio

Lanza ("Lanza"), Riccardo Manfrin ("Manfrin"), Maria Stellina Marescalchi ("Marescalchi"),

Fracassi Worldwide Shipping SRL ("Fracassi"), Oblyon Group, LLC ("Oblyon"), and Art

Lending, Inc. ("Art Lending"), (collectively, "Defendants") and a certain artwork (the

"Artwork") hereby alleges as follows.

**PARTIES**

1.      Plaintiff August Uribe Fine Art, LLC ("UFA") is a New York limited liability

company with its principal place of business at 300 West 108th Street, Suite 3-A, New York,

New York, 10025.

      a.  UFA was founded and is operated solely by August Uribe, who has had a long and successful career in the world of fine art as, among other things, a curator, an art gallery director, and a senior director at major auction houses, including Phillips and Sotheby's where, at the latter, he helped oversee record breaking sales, including $100 million+ artworks by Picasso and Monet. Mr. Uribe is also known for his work with charities, both (i) as an auctioneer who helped raise >$20 million through charity auctions alone and (ii) as a member of a number of nonprofit boards, including the Smithsonian's Archives of American Art and The Americas Society Gallery.

      b.  Along with many others, Mr. Uribe left Sotheby's in 2019 to form his own art-services company, UFA.

      c.  Over the many years that Mr. Uribe has worked in the art world, he developed a track record of locating and bringing valuable works of art into the art market for collectors, museums, and others.

2.      Defendant DARTMILANO SRL ("DART") is, upon information and belief, since

2020, a for-profit Italian company (No. MI-2592077) with a registered office at Via l Goldoni 1,

Milan, 20129, Italy.

3.      Defendant Pier Giulio Lanza ("Lanza") is an individual and citizen of Italy

residing at Via Carlo Crivelli 15/1, Milan, Italy.

2

4.     Defendant Riccardo Manfrin ("Manfrin") is an individual and is a principal of DART.

5.     Defendant Maria Stellina Marescalchi ("Marescalchi") is an art dealer who is, upon information and belief, a citizen and resident of both Italy and Switzerland and does business in Italy, Switzerland and, at least with respect to the Artwork, in New Jersey.

    a.     According to published sources, Marescalchi is involved in another matter involving art-related materials ("Modigliani Archives") that were also moved at her behest to a warehouse in Switzerland where she claims to have purchased them for approximately €280,000 in cash, "under the table," and according to one published account, "illegally . . . as nobody issued any invoice . . ."[1] According to another published report, Marescalchi later sought to sell the Modigliani Archives through another dealer for "over $4 million" and has been sued by a person claiming to be the seller of the archives for "embezzlement." The lawsuit is pending and the Modigliani Archives themselves were seized in Switzerland by Bellinzona Public Prosecutor's Office.[2]

6.     Defendant Oblyon Group, LLC ("Oblyon") is, since 2020, a Delaware limited liability company that states that its headquarters is in Barcelona, Spain and that it has "representation in New York, London, Milan, and Zurich."[3]

    a.     Oblyon purports to provide a number of services, including helping clients with "Buying & Selling," "Due Diligence," "Valuations," and "Art Financing Solutions," via, among others, "specialty lenders" and "investment funds."[4] According to published accounts, Oblyon worked with another art dealer who failed to pay for a multi-million-dollar artwork and "when he pitched the artwork

---

[1] DANIA MONDINI AND CLAUDIO LOIODICE, THE MODIGLIANI RACKET 55-56 (A.R.T. Publishing House, 2020).

[2] Lorenzo Bagnoli, *The Trial of Modigliani's Legacy*, IRPI MEDIA, Dec. 30, 2020, https://irpimedia.irpi.eu/il-processo-alleredita-di-modigliani/ (last visited and algorithm-translated on March 6, 2022).

[3] Oblyon Group, About, https://oblyon.com/about/ (last visited May 20, 2022).

[4] *Id.*, *see also generally* https://oblyon.com (last visited May 20, 2022).

and asked for a backdated letter of interest," Oblyon provided the requested backdated letter to him.[5]

7.      Defendant Art Lending, Inc. ("Art Lending") is, since 2018, a Nevada corporation, with a principal office address listed as "N/A" by the Nevada Secretary of State, but which appears to have an office at 10990 Wilshire Boulevard, Suite 1150, Los Angeles, California 90024, which is also the office of Shinnecock Partners ("Shinnecock"), "a family office investment boutique" that provides "in-depth analysis and proprietary quantitative tools along with rigorous due diligence to produce the best risk-adjusted performance for" its clients.[6]

      a.   According to materials published on Shinnecock's website, Art Lending is a "Master Fund" that receives cash from "Art Lending Fund LLC," a Delaware limited liability company, which is in turn funded by unidentified "Taxable, Tax-Exempt, & Offshore Investors."[7]

8.      Defendant Fracassi Worldwide Shipping SRL ("Fracassi") is, since 2001, an Italian company that has its principal place of business at Via Santo Spirito 11, Florence, 50125 Italy and, upon information and belief, uses and pays for fine art storage space, and maintains an account at, the New Jersey Warehouse (defined below).

9.      The Artwork is now being held at SRI Fine Art Services at 120 Brighton Road Clifton, New Jersey ("the New Jersey Warehouse"), which is in this District, and will not be released without a judgment of this Court or stipulation among all the parties to this action.

---

[5] ARTFORUM, *Sotheby's Sues Art Dealer Over $6.5 Million Keith Haring Bid*, Feb. 9, 2018, https://www.artforum.com/news/sotheby-s-sues-art-dealer-over-6-5-million-keith-haring-bid-74202 (last visited May 20, 2022).

[6] Shinnecock Partners, https://www.shinnecock.com/ (last visited May 20, 2022).

[7] Shinnecock Partners, *Art Lending Fund LLC (ALF) Fine Art Secured Lending*, Mar. 2022, at 18, https://www.shinnecock.com/alf/alf_presentation.pdf (stamped as "For exclusive use of clients of Shinnecock Partners," but publicly available on Shinnecock's website and last visited May 20, 2022).

**NATURE OF THIS ACTION**

10.     Plaintiff is the victim of a scheme devised, aided, and abetted by Defendants, including a private investment company, DART (which holds itself out as a "museum"), who conspired together to fraudulently gain control of the Artwork by agreeing to purchase it in installments so that, during the time when payments were still outstanding and title had not yet passed, the Artwork could be used as collateral for a loan, and then "flipped" at a high price through a quick resale. In that way, Defendants apparently believed that they could make a multi-million-dollar profit at no or, in one case, relatively little, risk to their own money.

11.     Defendants failed by their incompetence and dishonesty both (a) to sell the Artwork and (b) to understand that, due to the breadth and depth of UFA's contacts in the art market, their scheme would become apparent.

12.     While UFA eventually did learn of their efforts to sell the Artwork, Defendants had by then, through fraudulent means not as-yet fully known (but which included false representations from Marescalchi that museum "donors" needed to see it "well secured" at the New Jersey Warehouse before making the required payments to UFA) put the Artwork, first in the hands of Oblyon, and then in the control of Art Lending, a self-described "high-end pawnshop" that makes loans collateralized by artworks.[8]

13.     Both Oblyon and Art Lending, despite being shown undisputed documents evidencing that (a) DART has defaulted on its payment obligations and (b) UFA has an

---

[8] Laurence Darmiento, *How the rich get spending money: Locking fine art in storage and borrowing against it*, LOS ANGELES TIMES, Aug. 1, 2019, https://www.latimes.com/business/story/2019-07-31/art-secured-loans (last visited May 20, 2022).

unqualified right per its agreement with DART to possess the Artwork, have refused to allow the New Jersey Warehouse to release the Artwork to UFA.

14.    Accordingly, UFA seeks to (a) secure the Artwork and (b) recover damages for Defendants' wrongful actions, including *inter alia* (i) demonstrable consequential damages, and (ii) punitive damages for the fraudulent and intentionally tortious actions of Defendants.

## JURISDICTION AND VENUE

15.    Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship, and the amount in controversy and the value of the Artwork both exceed $75,000 by millions of dollars.

16.    Jurisdiction *in rem* and *quasi in rem* is also proper because Plaintiff seeks to remove encumbrances, and/or liens and/or a cloud upon the title to the Artwork, a multi-million-dollar work of fine art by one of the greatest artists in the history of art which is currently being held in this judicial district.

17.    The Court has personal jurisdiction over all of the Defendants as they have purposefully availed themselves of this jurisdiction by acting, communicating, and otherwise affecting an artwork transported to, and now located in, the New Jersey Warehouse in Clifton, New Jersey.

18.    Defendants DART, Lanza, and Manfrin have also consented in writing to the jurisdiction of this Court.

19.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2) because (a) a substantial part of the events and omissions giving rise to the claims, including the conversion of the Artwork, occurred in the District of New Jersey and (b) the Artwork, the property which is the subject of this action, is currently located in the District of New Jersey.

## FACTS

**UFA's Introduction to Marescalchi**

20.     Over the many years that Mr. Uribe has worked in the art world, he developed a track record of locating and bringing valuable works of art into the art market for collectors, museums, and others. After leaving Sotheby's, Mr. Uribe continued to be involved with high value works of art.

21.     During the summer of 2021, a friendly Spanish art dealer well-known to Mr. Uribe introduced Mr. Uribe to Ms. Marescalchi.

22.     Ms. Marescalchi represented to UFA that she had a museum client, DART, which wished to purchase the Artwork and asked UFA for help in arranging its purchase.

23.     Mr. Uribe located the Artwork, which was then being held in New York by an agent (the "Collector's Agent") for the owner of the Artwork (the "Collector").

24.     Ms. Marescalchi advised UFA that DART would purchase the Artwork for a sum in the millions of dollars (the "Agreed Price").

**The Contracts**

25.     UFA then contracted with the Collector's Agent to acquire the Artwork from the Collector (the "Collector-UFA Contract").

26.     At approximately the same time, DART contracted with UFA to purchase the Artwork for the Agreed Price (the "DART-UFA Contract") (the "Collector-UFA Contract and the "DART-UFA Contract" are herein collectively, the "Contracts").

27.     Lanza provided the DART-UFA Contract to UFA, which signed it without making any changes.

28.     The Collector-UFA Contract and the DART-UFA Contract are practically mirror images of each other with respect to payment terms and logistics.

29.     The DART-UFA Contract provides that DART would pay UFA in two installments—the first, equal to 20% of the Agreed Price in September 2021 and the second, equal to 80% of the Agreed Price, in November 2021.

30.     The Collector-MFA Contract provides that UFA would pay the Collector's Agent for the Artwork on virtually the same dates as DART was to pay UFA.

31.     The Contracts also both contained provisions that if any of the payments due were late or otherwise breached, the Artwork could be removed from fine art storage by UFA.

32.     The DART-UFA Contract specifies that UFA may remove the Artwork from fine art storage if in "any case and for any reason" DART shall "fail to pay" either of the two installments as agreed and that the Artwork would be held under UFA's name while in art storage.

**The Shipment of the Artwork to Long Island City, New York**

33.     In August 2021, the Artwork was moved to the Long Island City (New York) warehouse of Aiston LLC d/b/a Aiston Fine Art Services ("Aiston").

34.     Both the Collector's Agent and DART agreed in their respective Contracts that Aiston would hold the Artwork until the Agreed Price was paid in full.

**Marescalchi Falsely Represents to UFA that DART Donors Need to See and Verify the Artwork at the New Jersey Warehouse Before Releasing Payment**

35.     DART failed to pay UFA the first installment on the date agreed in the DART-UFA Contract.

36.     Marescalchi then contacted UFA on or about August 27, 2021 to explain DART's "general procedure," which was essentially that (1) DART "usually select some artworks that they like and want to acquire," (2) then DART "calls his [*sic*] donors and show [*sic*] them the

works, and finally (3) the donors make a "verification of the Artworks" to "be sure that the painting are [*sic*] well secured before sending the money."

37.     Also on or about August 27, 2021 and responding to a question from UFA Marescalchi stated "I don't know how many donors are giving money to [DART] to buy Artworks."

38.     Also on or about August 27, 2021, Marescalchi, acting in bad faith, represented that the donors were viewing other artworks to be acquired at The New Jersey Warehouse (*i.e.*, SRI Fine Art Services located in Clifton, New Jersey) and that to "have the [Artwork] in SRI with all of the others will allow the release of the payments" to UFA.

39.     Also on or about August 27, 2021, Marescalchi, acting in bad faith, represented and reassured UFA that "the problem" was simply "the change of the supplier of the warehouse" and that all would proceed at the New Jersey Warehouse "as it was planned with Aiston."

**The Artwork Moves to the New Jersey Warehouse**

40.     Aiston also assured UFA that "It's as if it's still in my warehouse. Only it's at SRI," the New Jersey Warehouse and, as the DART-UFA Contract states "h[e]ld [*sic*] under your name . . ."

41.     Based on the statements and representations above from Marescalchi, with comfort from the additional assurance of Aiston, UFA agreed to have the Artwork available to be seen and "verified" at the New Jersey Warehouse.

42.     At no time did DART, Marescalchi, or anyone else request or otherwise seek to have UFA deliver or give possession of the Artwork to DART at either Aiston or the New Jersey Warehouse.

43.     To the contrary, UFA understood and agreed that the Artwork would always remain in its possession and control "as it was planned with Aiston" in accordance with the terms of the DART-UFA Contract.

44.     At no time did UFA deliver or agree to deliver the Artwork to DART or any agent of DART.

45.     At no time did UFA deliver or agree to deliver the Artwork to Oblyon or to Art Lending.

46.     When UFA agreed to allow the DART "donors" to verify that the Artwork was "well secured" at the New Jersey Warehouse, it had no knowledge or information that DART was communicating with Oblyon and Art Lending and had no means of acquiring any such information.

47.     When UFA agreed to allow the DART "donors" to verify that the Artwork was "well secured" at the New Jersey Warehouse, it had no knowledge or information that DART, Marescalchi, and Fracassi were working in concert with Oblyon and Art Lending to unlawfully gain control of the Artwork and had no means of acquiring any such information.

48.     No authentic documents exist that reflect the transfer of any ownership interest or right to possess the Artwork to DART or to any of its agents.

49.     No authentic documents exist that reflect the transfer of any ownership interest or right to possess the Artwork to Oblyon or Art Lending.

**The Defendants Pull a Fast One, Move the Artwork, and**
**Claim That it is Collateral for a Loan to DART by Art Lending**

50.     Upon information and belief, on September 1, 2021, just days after the Artwork was transferred to the New Jersey Warehouse, and without the permission, authorization or

knowledge of UFA, Fracassi's managing director and Marco Mercanti, the CEO of Oblyon,

arranged for the transfer of the Artwork to Oblyon's account at the New Jersey Warehouse.

51.    Neither Fracassi nor Oblyon had title or any right to possess the Artwork.

52.    Upon information and belief, on September 9, 2021, again without the

permission, authorization or knowledge of UFA, Oblyon, through Mercanti, then transferred the

Artwork to Art Lending.

53.    Upon information and belief, Oblyon was communicating with the New Jersey

Warehouse using the name "Elysium."

54.    UFA does not have and has never had, any interaction or knowledge of Elysium.

55.    Upon information and belief, DART then secured a loan from Art Lending using

the Artwork as collateral, despite the fact that DART had neither acquired title nor the right to

possess the Artwork since it failed to satisfy its payment obligations set forth in the DART-UFA

Contract.

56.    Upon information and belief, Art Lending alleges that it maintains a lien on the

Artwork, despite the fact that DART had neither acquired title nor the right to possess the

Artwork because (a) it failed to satisfy its payment obligations set forth in the DART-UFA

Contract, and (b) the Artwork was fraudulently transferred and UFA never delivered the Artwork

to DART or any other purchaser.

57.    Upon information and belief, Art Lending is a start-up company launched in 2019

that has no full-time employees in Nevada and that is owned and operated by Shinnecock.

58.    Upon information and belief, Art Lending does not pay for the costs of storing the

Artwork.

59.     Upon information and belief, Shinnecock claims that its art-lending business, including that conducted through Art Lending, is "thorough" in conducting "extensive due diligence checks" into the current and prior ownership of artworks that it takes as loan collateral: Its principal, Alan Snyder, can heard on YouTube stating that the "chain of title to art" is "critical" and that, correspondingly, a "nauseating attention to detail" about such matters is required and undertaken.[9] Art Lending also claims that it rejects two-thirds of loan applications, with one of the main reasons being "lack of acceptable provenance/chain of title."

60.     Upon information and belief, Art Lending did little or no research into the chain of title related to the Artwork or willfully ignored that DART lacked title to the Artwork and, by way of example, never requested any documentation that title had transferred or that payment had been made for the Artwork. The "Proof of Ownership" required by Art Lending's loan documentation guidelines was not obtained, as none exists.

**DART Defaults Again on its Payment Obligations and "Shops" the Artwork**

61.     Despite numerous communications from DART to UFA containing assurances of payment, DART, in bad faith, did not pay the remaining balance due to UFA when due in November 2021.

62.     In February of 2022, UFA was contacted by another art seller who was shopping the Artwork and offering to sell the Artwork to UFA for millions of dollars more than DART had agreed to pay for it.

63.     Upon information and belief, Defendants, through Oblyon and others, continued to try to market the Artwork for sale at an inflated price.

---

[9] Beyond Wall Street, *Fine Art Lending - Old Masters - New Income Strategy?*, June 13, 2021 https://www.youtube.com/watch?v=Yp2fAG5Nt7w (last visited May 18, 2022).

64.     Once UFA learned that the Artwork was being shopped for sale, it discovered that the Artwork had somehow been transferred to Art Lending via Oblyon.

65.     Once UFA learned that the Artwork was being shopped for sale it also determined that, upon information and belief, DART, its principals, Marescalchi, Fracassi, Oblyon, and Art Lending acted in concert to achieve the general objective of facilitating the transfer of the Artwork to Art Lending's storage account at the New Jersey Warehouse, thereby converting the Artwork so that Defendants could use the Artwork as collateral for a loan from Art Lending and "flip" the Artwork for a large profit via Oblyon.

**UFA Confirms that the Artwork Will Not Be Moved**

66.     UFA contacted the New Jersey Warehouse and confirmed that it would hold the Artwork.

**DART and its Principals Acknowledge the Breach and Reconfirm the Obligation to Pay**

67.     When UFA, through counsel, contacted DART, it and its principals claimed in bad faith that they were not offering the Artwork for sale and would pay the full purchase price in a contract dated March 10, 2022 (the "DART Personal Guaranty Contract").

68.     DART's principals, Lanza and Manfrin, personally guaranteed DART's obligations under the DART Personal Guaranty Contract.

69.     The DART Personal Guaranty Contract provides that New Jersey law governs the DART-UFA Contract and the DART Personal Guaranty Contract.

## COUNT I
### (Breach of Contract—Against DART, Lanza, and Manfrin)

70.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.     DART and UFA are parties to a valid and existing contract, namely, the DART-UFA Contract.

72.     DART, Lanza, Manfrin, and UFA are also parties to the DART Personal Guaranty Contract, also a valid and existing contract.

73.     DART has breached its obligations under the DART-UFA Contract including, but by no means limited to, failing to make any installment payments for the Artwork as contractually required.

74.     DART has also breached the DART-UFA Contract by refusing to allow UFA to remove the Artwork from the New Jersey Warehouse, despite agreeing that UFA could do so if in "any case and for any reason" DART failed to pay the sum due to UFA.

75.     UFA performed its obligations under the DART-UFA Contract by causing the Artwork to be transported to Aiston until the Agreed Price was paid in full.

76.     DART, Lanza, and Manfrin have breached their obligations under the DART Personal Guaranty Contract including, but by no means limited to, failing to pay for the Artwork.

77.     UFA performed its obligations under the DART Personal Guaranty Contract by delaying bringing legal action to recover the Artwork and damages and extending the time for DART, Lanza, and Manfrin to pay for the Artwork.

78.     UFA has suffered damages because of the breaches of DART, Lanza, and Manfredi, including money damages and damages arising out UFA's inability to remove the Artwork from fine art storage due to the actions and omissions of DART, Lanza, and Manfrin.

79.     As a result of the foregoing, UFA is entitled to damages in an amount to be proven at trial that is well more than $5,000,000, and the return of the Artwork.

## COUNT II
### (Conversion—Against DART, Fracassi, Oblyon, and Art Lending)

80. Plaintiff repeats and realleges the allegations in Paragraphs 1 through 79 of this Complaint as though fully set forth herein.

81. The right of UFA to possess the Artwork so that it can be returned to the Collector is superior to any right claimed by the Defendants and was superior to any right to the Artwork claimed by any and all of the Defendants.

82. DART, Fracassi, Oblyon, and Art Lending have nonetheless (a) assumed and exercised rights of ownership and possession inconsistent with UFA's superior rights of possession, (b) exercised dominion and control over the Artwork, thereby seriously interfering with UFA's superior rights of dominion and control, and (c) repudiated UFA's rights by attempting to commercially exploit their claimed interest in the Artwork.

83. UFA has demanded the return of the Artwork.

84. DART, Fracassi, Oblyon, and Art Lending have refused to return the Artwork.

85. The actions of DART, Fracassi, Oblyon, and Art Lending were and are gross, wanton, and deliberate. They demonstrate a high degree of culpability in that they have (a) acted with actual knowledge, and/or reckless disregard for the truth of the fact that none of the Defendants ever had ownership, title, or the right to possess, and/or exercise dominion or control the Artwork and (b) with intentional reckless disregard of UFA's rights and those of the Collector.

86. UFA has been damaged as a result of the Defendants' unlawful conversion of the Artwork in an amount to be proven at trial that is well more than $5,000,000.

15

**COUNT III**
**(Fraud—Against DART, Lanza, Manfrin, and Marescalchi)**

87.   Plaintiff repeats and realleges the allegations in Paragraphs 1 through 86 of this Complaint.

88.   Defendants participated in the perpetration of a fraud on Plaintiff.

89.   Defendants DART, Lanza, Manfrin, and Marescalchi, directly or through Marescalchi, intentionally made material misrepresentations of fact to Plaintiff, including, but not limited to, (a) the August 19, 2021 text messages representing that the Artwork was intended to be acquired for display at DART, which they represented to be a "museum," (b) the text messages sent on or about August 27, 2021 representing that DART "donors" needed to see and verify the Artwork in the New Jersey Warehouse along with other works being acquired for DART to enable DART to pay for the Artwork, (c) the text messages sent on or about August 27, 2021 representing that all would proceed at the New Jersey Warehouse "as it was planned with Aiston," *i.e.*, the Artwork would be held under the name of UFA in accordance with the DART-UFA Contract, and (d) in email correspondences dated December 28, 2021 that delays in payment for the Artwork were caused by "bureaucracy problems," "winter holidays," bank errors, and other immaterial matters.

90.   These representations were false. At all relevant times, Defendants DART, Lanza, Manfrin, and Marescalchi intended to use the Artwork as collateral for a loan from Art Lending and to "flip" the Artwork for a large profit via Oblyon.

91.   Defendants DART, Marescalchi, Lanza, and Manfrin knew that the representations were false when and/or that they were made recklessly without regard to whether they were true or false.

16

92.     Defendants DART, Marescalchi, Lanza, and Manfrin made these representations to induce Plaintiff to rely upon them and, among other things have the Artwork transferred to the New Jersey Warehouse so that it could then be unlawfully transferred to the account of Oblyon and then to Art Lending without the knowledge of UFA.

93.     Plaintiff actually and justifiably relied on the representations because, among other things, (a) Marescalchi was introduced to Plaintiff by a trusted colleague and was to receive a commission from the proceeds of the sale of the Artwork, (b) Marescalchi provided detailed information about DART and its acquisition process, (c) there is a high level of trust in museums among art world professionals generally, (d) Marescalchi provided information to Plaintiff that indicated that DART was affiliated with a highly regarded Italian museum of high standing and reputation, and (e) the DART-UFA Contract, drafted by DART, stated specifically both (i) that the Artwork would always be held and insured for the benefit of UFA and (ii) that Plaintiff would be entitled to "regain possession" of the Artwork at any time" following DART's failure to timely pay for the Artwork.

94.     Plaintiff sustained damages exceeding $5,000,000 because, among other reasons, Plaintiff neither has (a) possession, dominion, or control of the Artwork nor (b) the funds due from DART, Lanza, and Manfrin with which the Collector can be paid.

95.     At all relevant times, the actions of Defendants DART, Marescalchi, Lanza, and Manfrin were knowingly deceitful and maliciously intended to cause Plaintiff harm and to enrich themselves at Plaintiff's expense.

**COUNT IV**
**(Aiding And Abetting Fraud- Against Fracassi, Oblyon, and Art Lending)**

96.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 95 of this Complaint as though fully set forth herein.

97.     As outlined above, Plaintiff was the victim of a fraud.

98.     Defendants' DART, Lanza, Manfrin, and Marescalchi's fraud was perpetrated on Plaintiff through their commission of wrongful acts, including the unauthorized transfer of the Artwork to Oblyon and then to Art Lending with the knowing and substantial participation of Fracassi, Oblyon, and Art Lending.

99.     By conducting its vaunted "nauseating" level of diligence, which must have revealed that DART had no documentation whatsoever reflecting its having taken title to the Artwork or that the Artwork had been delivered to DART or otherwise lawfully transferred into its possession (because the documentation required full payment and for the Artwork to be held in UFA's name with the right to collect it at the Warehouse if timely payments were not made), Art Lending had actual knowledge that DART did not have title to the Artwork and that it could not be moved or used as collateral for a loan.

100.    Upon information and belief, Art Lending also has a relationship with Oblyon, including as a referral source, and (a) worked in concert with Defendants to get control of the Artwork in the New Jersey Warehouse and (b) was aware that Oblyon intended to have the Artwork offered for sale at a profit that would also benefit Art Lending directly and indirectly as a means of marketing Shinnecock's art lending business.

101.    Upon information and belief, Oblyon also had actual knowledge that DART had not acquired title to, or any right to possess the Artwork, but nonetheless assisted in arranging the transfer of the Artwork into an account Oblyon itself controlled at the New Jersey Warehouse, and then to an account controlled by Art Lending.

102.    Upon information and belief, Oblyon, which boasts of an "Art Trading" business that calls upon "a strong international network of dealers," etc., also assisted the other

Defendants to have the Artwork offered for sale to others, despite DART's having no right to offer the Artwork for sale.

103.     Upon information and belief, Fracassi knew both (a) from Aiston and (b) by virtue of DART's agreement with UFA that the Artwork would be held for the benefit of UFA and could not be held under the name of any other person or entity.

104.     Upon information and belief, Art Lending, Oblyon, and Fracassi worked to together with and provided substantial assistance to DART, Lanza, Manfrin, and Marescalchi to move the Artwork into one account controlled by Oblyon and then into another account controlled by Art Lending at the New Jersey Warehouse.

105.     Upon information and belief, Art Lending thereafter further assisted DART by providing funds to DART, which DART used to make partial payments to UFA and thereby delay discovery of the fraud.

106.     Upon information and belief, Art Lending knew of Oblyon's efforts to have the Artwork sold by others, despite its not having been paid for or lawfully acquired by DART.

107.     The actions of Art Lending, Fracassi, and Oblyon were gross, wanton, and willful to a high degree.

108.     The actions of Art Lending, Fracassi, and Oblyon in assisting with the transfer of the Artwork to Oblyon's, and then Art Lending's accounts was a substantial factor in causing injury to Plaintiff.

109.     Plaintiff has been damaged because of Art Lending, Fracassi, and Oblyon's aiding and abetting of fraud in an amount to be proven at trial that is well in excess of $5,000,000.

## COUNT V
### (Replevin—Against DART, Fracassi, Oblyon, and Art Lending)

110.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 109 of this Complaint as though fully set forth herein.

111.     UFA has the right to possess and control the Artwork that is superior to the rights of all Defendants.

112.     The right of Plaintiff to possess the Artwork is superior to any right claimed by any of the Defendants.

113.     Defendants DART, Fracassi, Oblyon, and Art Lending have each claimed a right to either (a) possess and control the Artwork or (b) prohibit UFA from regaining possession of the Artwork despite its rights under both the DART-UFA Contract and applicable law, thereby unlawfully and without authority intermeddling and interfering with Plaintiff's right of possession.

114.     Despite due demand, and without legal justification, the Defendants have refused to return or allow the return of the Artwork to UFA.

115.     As a result of the foregoing, UFA is entitled to the immediate return of the Artwork.

## COUNT VI
### (Conspiracy – Against all Defendants)

116.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 115 of this Complaint as though fully set forth herein.

117.     Defendants knowingly and willfully conspired and agreed among themselves to use improper and unlawful means to act in concert in order to fraudulently convert the Artwork to injure Plaintiff and to benefit Defendants at Plaintiff's expense.

118.     Defendants have committed overt acts in furtherance of Defendants' aforementioned agreement, in particular, by making false representations of fact concerning the transfer of the Artwork from Aiston to the New Jersey Warehouse and that any such transfer would maintain the Artwork under Plaintiff's account in accordance with the DART-UFA Contract and, without UFA's knowledge or authorization, unlawfully transferred the Artwork to Defendants' various accounts with the New Jersey Warehouse.

119.     As a result of these overt acts, Plaintiff has been damaged in an amount to be proven at trial that is well in excess of $5,000,000.

**COUNT VII**
**(Order Quieting Title and Possession Under 28 U.S.C. § 1655 – In Rem/Quasi In Rem)**

120.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 119 of this Complaint as though fully set forth herein.

121.     Plaintiff has a right of possession of and proprietary interest in the Artwork and is therefore entitled to recover sole and immediate possession of the Artwork.

122.     Defendants DART, Oblyon, and Art Lending have been in unauthorized possession of the Artwork and, on information and belief, have falsely and erroneously claimed to both Plaintiff and others, that they either (a) own the Artwork and/or (b) have the right to possess, control, sell or otherwise exercise dominion over it.

123.     Defendants have caused the Artwork to be held at the New Jersey Warehouse in Clifton, New Jersey, where they currently and unlawfully maintain possession, control, and dominion, over the Artwork, rendering the Artwork having situs in this judicial district.

124.     There is a dispute and actual controversy and disagreement between Plaintiff and one or more of the Defendants regarding whether Plaintiff of Defendants have superior claim to the Artwork.

125.     Plaintiff has demanded the return of the Artwork, and Defendants have refused to deliver the Artwork to Plaintiff.

126.     Plaintiff has no adequate remedy, at law because the Artwork is unique, and it has obligations to the Collector.

127.     Plaintiff is entitled to a declaratory judgment from this Court that Plaintiff is has the sole right to possess the Artwork to the exclusion of all others except the Collector, that all right, title, interest, and ownership in and to the Artwork is vested in Plaintiff, and that Defendants have no right, title, interest or claim of ownership in the Artwork.

## COUNT VIII
### (Breach of Bailment Agreement – Against Fracassi)

128.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129.     UFA, in accordance with the DART-UFA Agreement, provided the Artwork to Fracassi in trust for the specific purpose of holding the Artwork in UFA's name until DART's payment obligations were satisfied or UFA requested return of the Artwork as set forth in the DART-UFA Contract.

130.     Fracassi received and accepted the Artwork at the New Jersey Warehouse from UFA, via Aiston, which, pursuant to the DART-UFA Agreement, held the Artwork the name of UFA for the specific purpose set forth above.

131.     Pursuant to both the DART-UFA Agreement and operation of law, a bailment between UFA and Fracassi was created.

22

132.     Fracassi breached its obligations by allowing and assisting DART, Lanza, Manfrin, Marescalchi, Oblyon, and Art Lending to, on information and belief, remove the Artwork from an account in UFA's name and thereby prevent or limit UFA from regaining possession of the Artwork from the New Jersey Warehouse.

133.     Fracassi's breach of its bailment obligations has caused UFA damage, including money damages in an amount to be proven at trial that is well in excess of $5,000,000 and also the loss of access to the Artwork.

**WHEREFORE**, Plaintiff prays that this Court enter Judgment in its favor and against Defendants:

a.     Ordering Defendants DART, Lanza, and Manfrin to pay Plaintiff damages for their breaches of the DART-UFA Contract and the DART Personal Guaranty Contract as well as attorneys' fees as provided therein, including interest;

b.     Ordering Defendants DART, Lanza, Manfrin, Oblyon, and Art Lending to pay Plaintiff damages in the amount of the fair market value of the Artwork, including interest, for converting the Artwork;

c.     Ordering Defendants DART, Lanza, Manfrin, and Marescalchi to pay Plaintiff damages, including punitive damages, for the fraud that they perpetrated on Plaintiff;

d.     Ordering Defendants Fracassi, Art Lending, and Oblyon to pay Plaintiff damages, including punitive damages, for aiding and abetting the fraud perpetrated on Plaintiff;

e.     Ordering all Defendants to pay Plaintiff damages, including punitive damages, for conspiring against Plaintiff to fraudulently convert the Artwork;

f.     Ordering the immediate release of the Artwork to Plaintiff or the Collector as directed by Plaintiff, the Collector, or the Collector's Agent;

g.      Declaring that Plaintiff has a superior right to possess, control, and direct the New

Jersey Warehouse with respect to all matters concerning the Artwork;

h.      Declaring that any liens on the Artwork are null and void and directing that those

who placed any liens must remove them and authorize the release of the Artwork to Plaintiff;

i.      Awarding Plaintiff the costs and expenses of this action, including interest, its

reasonable attorneys' fees as allowed by law and as specified in the Personal Guaranty Contract;

and

j.      Awarding Plaintiff such other and further relief as the Court may deem just and

proper.


**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, August Uribe Fine Art, LLC hereby

demands trial by jury in this case.


Louis H. Miron
*Attorney for Plaintiff*
*August Uribe Fine Art, LLC*

Dated: 2022-May-25

LOUIS H. MIRON

**VERIFICATION PURSUANT TO LOCAL RULE 11.2**

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Louis H. Miron
*Attorney for Plaintiff*
*August Uribe Fine Art, LLC*

Dated: 2022-May-25

LOUIS H. MIRON