UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AUGUST URIBE FINE ART, LLC,

*Plaintiff,*

- against –

DARTMILANO SRL, PIER GIULIO LANZA, RICCARDO MANFRIN, MARIA STELLINA MARESCALCHI, FRACASSI WORLDWIDE SHIPPING SRL, OBLYON GROUP, LLC, and ART LENDING, INC.,

*Defendants,*

- and –

A CERTAIN ARTWORK,

*Defendant-in-rem.*

Civil Case No. 22-cv-03104 (MCA) (JBC)

Hon. Madeline Cox Arleo U.S.D.J.

SOTHEBY'S, INC.,

*Intervenor-Plaintiff,*

- against –

DARTMILANO SRL, PIER GIULIO LANZA and RICCARDO MANFRIN,

*Defendants,*

- and –

ART LENDING, INC.,

*Third-Party Defendant,*

- and –

A CERTAIN ARTWORK,

*Defendant-in-rem.*

MARIA IRIDE CRIPPA,



1

<div style="border:1px solid">

*Intervenor Plaintiff,*

- against –

DARTMILANO SRL, and ART LENDING, INC.

*Intervenor-Defendants.*

</div>

## DECLARATION OF MARIA IRIDE CRIPPA

I, Maria Iride Crippa, hereby make this Declaration pursuant to 28 U.S.C. § 1746.

1.      I am an Intervenor Plaintiff in the above-referenced lawsuit.

2.      I make this declaration in support of my motion for summary judgment to obtain the release and return to me of a certain painting discussed below. This declaration is based upon my personal knowledge of and/or personal involvement in and best recollection of the events described herein, together with my review of relevant documents.

3.      I was married to Nicola Carlo Luciani from 2002 until our separation in 2013 and our divorce in 2015. We separated in 2013. During the time we were together, he was an art dealer and collector in Milan, Italy (where we lived), buying and selling many pieces of art over the years.

4.      In 2009, Mr. Luciani purchased from Alessandro Zodo the painting by Pablo Picasso known as *Le Peintre* (the "Artwork"). At the time, I understood Mr. Zodo was also an art dealer and collector in Milan, having heard my ex-husband speak his name many times over the years.

5.      For this lawsuit, my ex-husband was able to obtain a letter from Mr. Zodo (who still resides in Milan, where my ex-husband also resides), confirming that he sold the painting to my ex-husband. Mr. Zodo's letter is dated October 21, 2024, addressed to him, written in Italian, stating in its entirety: "Esteemed Mr. Nicola Luciani, I confirm that in the year 2009 I sold you the work of Pablo Picasso Le Peintre, cm 100 x 81 cm, year 1967, Zervos Catalog vol. XXV Paris 1972, n. 280. I confirm the authenticity of the work. Best regards Alessandro

2



Zodo". I am sufficiently fluent in Italian (my native tongue) and English that I was able to translate the letter myself. I hereby certify and declare that it is to the best of my ability, knowledge and belief, a true, complete, correct and accurate translation thereof. A true and correct copy of that letter is attached hereto as Exhibit 1.

6. My husband owned and possessed the Artwork from 2009 until on or about May 16, 2013. At that time, we entered into a separation agreement, homologated by the Tribunal of Milan (an Italian Court of general jurisdiction in which we resided and our divorce was filed), which addressed the division of our marital assets, including the Artwork. That agreement formalized the transfer of the Artwork's ownership into my name. I took physical possession of the Artwork at that time.

7. On or about July 8, 2015, that separation agreement was made a part of our divorce judgment before the Milan Tribunal, which confirmed my ownership of the Artwork. That divorce judgment was filed in the Milan Tribunal. It is my understanding that the filing of such judgment is required by Italian law to be filed or recorded in such court in order to give to the divorce formal force and legal effect. A true, correct, certified copy of our divorce judgment filed in the office of the Milan Tribunal (and bearing the stamps evidencing such filing) is attached hereto as Exhibit 2, together with a certified translation thereof.

8. Leaving aside the security interest that I am advised Intervenor-Defendant Art Lending, Inc. now claims in the Artwork (which I contest as invalid), at no time while my ex-husband or I owned the Artwork did anyone ever claim an ownership interest in it, or otherwise contest his or my ownership or the authenticity of it.

9. For many years, Sotheby's (Milan) was engaged to promote and market the Artwork with a view toward identifying major collectors and potential buyers. Prior to my separation, in July 2012, the Artwork was publicly exhibited at Dickinson (a private art gallery)

3



in London. In January, 2014, the Artwork was publicly displayed at a Sotheby's media preview in Hong Kong. Raphaella Blanga of (Sotheby's Milan) became my point of contact.

10. No later than June, 2019, I agreed to allow Sotheby's (Milan) to publicly exhibit and/or auction the Painting in 2019 as part of one or more "Impressionist & Modern Art" exhibits and/or auctions, to take place in London, New York and Hong Kong. I would have never agreed to allow the Artwork to be publicly displayed over a period of several years if I had any reservations about having good title to the Artwork.

11. I permanently moved from Milan to Lugano, Switzerland in 2013, which then became my permanent residence. I continuously stored the Artwork at a warehouse in Chiasso, Switzerland since that time (other than when it was temporarily sent to other locations at Sotheby's direction for exhibition or potential sales).

12. Over time, following the advice and recommendations of Ms. Blanga, I entered into three written sale agreements with Sotheby's concerning the Artwork, (a) starting with a May 8, 2020 private sale agreement with Sotheby's (London), (b) followed by a July 21, 2020 private sale agreement with Sotheby's (New York), (c) followed by an August 24, 2021 private sale agreement with Sotheby's (New York) (the "Consignment Agreement"). A true and correct copy of the Consignment Agreement is attached hereto as Exhibit 3 (together with an amendment thereto, addressed below).

13. Neither of the first two agreements with Sotheby's contained a temporary loan provision.

14. Shortly before signing the Consignment Agreement, I was advised that a temporary viewing of the Artwork would be granted. Then the document was sent by Ms. Blanga for execution as soon as possible, because Sotheby's had found a buyer. While I generally looked over the document, I did not review it for any provisions that were materially different from the earlier agreements and sent the signed version back the same day. Thus,

4



when I signed it, I was not aware that it contained a temporary loan provision or a title retention provision. (Ex. 2, ¶ 3.)

15.    To be clear, I had no intention of allowing title to pass to the buyer unless and until I had received full payment of the purchase price.

16.    After I signed the Consignment Agreement, I was not advised that the Artwork had immediately been temporarily loaned to the buyer. At the time, I was never advised of the name of the buyer and I never saw the purchase agreement that the buyer signed with Sotheby's. At the time, I was not made aware that the buyer had entered into its own simultaneous (/k/a "back-to-back") sale agreement with its own buyer, or that the buyer could use the money from its own buyer to pay Sotheby's. Information about the foregoing became known to me much later, some after litigation was commenced and some shortly before.

17.    Pursuant to the Consignment Agreement, I agreed to accept a price of $5 million. Sotheby's commission was to be any portion of the purchase price that exceeded the $5 million (together with certain reimbursable sale costs). (Ex. 2, ¶¶ 1, 4.)

18.    A nonrefundable deposit of twenty percent was due by September 10, 2021, and the remainder was due ninety days after the buyer received Sotheby's sale invoice. I understood that ninety days to expire in late November, 2021.

19.    I was soon advised about payment issues, since the first payment was made ten days late on September 20, 2021, and final payment (which was never made in full) was not paid when due.

20.    On February 18, 2022, at request of Sotheby's, I signed an amendment to the Consignment Agreement, giving the buyer until February 28, 2022 to make another nonrefundable installment of $500,000, with the remainder due by March 22, 2022. (Ex.1.) Those payments were not received.

5



21. Over the course of one year, I received the following five payments from Sotheby's totaling $2,300,000 with respect to the sale of the Artwork: $1,000,000 on September 20 or 21, 2021; $800,000 on February 1 or 2, 2022; $300,000 on May 3, 2022; $100,000 on July 19, 2022; and $100,000 on September 21, 2022.

22. Despite the buyer's failure to pay the full purchase price, the Artwork has never been returned to me as provided for by the Consignment Agreement, despite my repeated demands through counsel. I have also been informed that a New Jersey warehouse called SRI Fine Art Services has possession of the Artwork, and will not release it without a court order.

23. On October 18, 2023, through my counsel, I terminated Sotheby's authority to act on my behalf as agent, consignee or otherwise.

24. Thereafter, in addition to intervening into this lawsuit in order to obtain recovery of the Artwork, I also intervened into an existing lawsuit in New York State Court between Sotheby's and August Uribe Fine Art, LLC, seeking the Artwork and/or money damages from both parties.

25. At no time prior to or during the operative events had I previously heard the names of the parties to this lawsuit (other than Sotheby's), namely August Uribe, August Uribe Fine Art, DartMilano SRL, Pier Giulio Lanza, Riccardo Manfrin, Maria Stellina Marescalchi, Fracassi Worldwide Shipping SRL, Oblyon Group LLC/Marco Mercanti or Art Lending, Inc. I had no contemporaneous dealings with any of the aforementioned companies or individuals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 27 day of February, 2025 in Lugano, Switzerland.

_____
Maria Iride Crippa

6