**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AUGUST URIBE FINE ART, LLC, | |
| *Plaintiff*, | |
| - against - | |
| DARTMILANO SRL, PIER GIULIO LANZA, RICCARDO MANFRIN, MARIA STELLINA MARESCALCHI, FRACASSI WORLDWIDE SHIPPING SRL, OBLYON GROUP, LLC, and ART LENDING, INC., | |
| *Defendants*, | |
| - and - | |
| A CERTAIN ARTWORK, | |
| *Defendant-in-rem.* | Case No. 22-cv-03104 (MCA)(JBC) |
| SOTHEBY'S, INC., | Hon. Madeline Cox Arleo, U.S.D.J. |
| *Intervenor-Plaintiff*, | |
| - against - | |
| DARTMILANO SRL, PIER GIULIO LANZA and RICCARDO MANFRIN, | |
| *Defendants*, | |
| - and - | |
| ART LENDING, INC., | |
| *Third-Party Defendant*, | |
| - and - | |
| A CERTAIN ARTWORK, | |
| *Defendant-in-rem.* | |

MARIA IRIDE CRIPPA,

               *Intervenor-Plaintiff*,

      - against -

DARTMILANO SRL and ART LENDING, INC.,

*Intervenor-Defendants*.

**INTERVENOR-PLAINTIFF MARIA IRIDE CRIPPA'S STATEMENT
OF UNDISPUTED MATERIAL FACTS**

FLOYD ZADKOVICH (US) LLP
Edward W. Floyd
Joseph Johnson
33 East 33rd Street, Suite 905
New York, New York 10016
ed.floyd@floydzad.com
Phone: (917) 999-6914
joe.johnson@floydzad.com
Phone: (917) 375-9511

*Attorneys for Intervenor-Plaintiff
Maria Iride Crippa*

Intervenor Plaintiff Maria Iride Crippa ("Crippa"), by and through her undersigned counsel, Floyd Zadkovich (US) LLP, pursuant to Rule 56.1(a) of the Local Civil Rules of the United States District Court for the District of New Jersey, submits this Rule 56.1 Statement of Material Facts Not in Dispute.

Crippa hereby expressly refers to, adopts and incorporates by reference the Rule 56.1 Statement of Material Facts submitted by Intervenor Plaintiff Sotheby's, Inc. ("SSOMF") as part and in support of Crippa's moving papers.

## I.   Ms. Crippa's Ownership of the Artwork.

1.      Crippa is an Italian citizen permanently residing in Lugano, Switzerland since 2013. (February 27, 2025 Decl. of Maria Iride Crippa ("Crippa Decl.") at ¶ 11.)

2.      In 2008, Alessandro Zodo ("Zodo") purchased an oil painting by Pablo Picasso entitled *Le Peintre* (1967) (the "Artwork") from a Tokyo art dealer. (December 16, 2024 Declaration of Alessandro Zodo ("Zodo Decl.") ¶ 3.)

3.      In 2009, Zodo sold the Artwork to Nicola Carlo Luciani ("Luciani").  (Zodo Decl. ¶ 3; December 13, 2024 Declaration of Nicola Carlo Luciani ("Luciani Decl.") ¶ 4; Crippa Decl. ¶¶ 4-5 and Ex. 1 thereto.)

4.      At no time while Zodo owned the Artwork did anyone ever claim an ownership interest in it or otherwise contest his ownership or the authenticity of it. (Zodo Decl. ¶¶ 4-5.)

5.      At the time Zodo sold the Artwork to Luciani, Luciani and Crippa were married; they separated in 2013. (Crippa Decl. ¶¶ 2-3; Luciani Decl. ¶¶ 4-5.)

6.      Luciani owned and possessed the Artwork from 2009 until on or about May 16, 2013. (Crippa Decl. ¶¶ 2-3; Luciani Decl. ¶¶ 4-5.)

7.      Crippa received the Artwork on or about May 16, 2013 in conjunction with a separation agreement she entered into with Luciani at that time, which was homologated by the

Tribunal of Milan (an Italian Court of general jurisdiction in which their divorce proceeding was filed). (Crippa Decl. ¶ 6; Luciani Decl. ¶ 5.)

8.    On July 8, 2015, the separation agreement was made a part of the divorce judgment between Crippa and Luciani, confirming that Crippa received title to the Artwork. (Crippa Decl. ¶ 7 and Exhibit 2 thereto; Luciani Decl. ¶ 6.)

9.    At no time while Luciani owned the Artwork did anyone ever claim an ownership interest in it or otherwise contest his ownership or the authenticity of it. (Luciani Decl. ¶ 7.)

10.    Crippa took the Artwork with her to Switzerland in 2013 and stored it in a warehouse in Chiasso. (Crippa Decl. ¶ 11.)

11.    For many years, Intervenor-Plaintiff Sotheby's, Inc. ("Sotheby's") (Milan) was engaged to promote and market the Artwork with a view toward identifying major collectors and potential buyers. (Crippa Decl. ¶ 9.)

12.    Crippa continuously stored the Artwork in the Chiasso warehouse except when it was temporarily sent to other locations at Sotheby's direction for exhibition or potential sales. (Crippa Decl. ¶11.)

13.    In January, 2014, the Artwork was publicly displayed at a Sotheby's media preview in Hong Kong. (Crippa Decl. ¶ 9.)

14.    No later than June, 2019, Crippa agreed to allow Sotheby's (Milan) to publicly exhibit and/or auction the Painting in 2019 as part of one or more "Impressionist & Modern Art" exhibits and/or auctions, to take place in London, New York and Hong Kong. (Crippa Decl. ¶ 10.)

15. Crippa would have never agreed to allow the Artwork to be publicly displayed over a period of several years if she had any reservations about having good title to the Artwork. (Crippa Decl. ¶ 10.)

16. Raphaella Blanga of (Sotheby's Milan) became Crippa's point of contact. (Crippa Decl. ¶ 9.)

17. Over time, following the advice and recommendations of Ms. Blanga, Crippa entered into three written sale agreements with Sotheby's concerning the Artwork, (a) starting with a May 8, 2020 private sale agreement with Sotheby's (London), (b) followed by a July 21, 2020 private sale agreement with Sotheby's (New York), (c) followed by an August 24, 2021 private sale agreement with Sotheby's (New York) (the "Consignment Agreement"). (Crippa Decl. ¶ 12; Exhibit 3 thereto.)

18. Neither of the first two agreements with Sotheby's contained a temporary loan provision. (Crippa Decl. ¶ 13.)

19. Shortly before signing the Consignment Agreement, Crippa was advised that a temporary viewing of the Artwork would be granted by Sotheby's. (Crippa Decl. ¶ 14.)

20. The document constituting the unsigned Consignment Agreement was sent by Ms. Blanga to Crippa for execution as soon as possible, because Sotheby's had found a buyer. (Crippa Decl. ¶ 14.)

21. While Crippa generally looked over the document constituting the unsigned Consignment Agreement, she did not review it for any provisions that were materially different from the earlier agreements and sent the signed version back the same day. (Crippa Decl. ¶ 14.)

22. When Crippa signed the Consignment Agreement, she was not aware that it contained a temporary loan provision or a title retention provision. (Crippa Decl. ¶ 14.)

23.     Crippa had no intention of allowing title to pass to the buyer unless and until she had received full payment of the purchase price. (Crippa Decl. ¶ 15.)

24.     After Crippa signed the Consignment Agreement, she was not advised that the Artwork had immediately been temporarily loaned to the buyer. (Crippa Decl. ¶ 16.)

25.     At the time, Crippa was never advised of the name of the buyer and she never saw the purchase agreement that the buyer signed with Sotheby's. (Crippa Decl. ¶ 16.)

26.     At the time, Crippa was not made aware that the buyer had entered into its own simultaneous (/k/a "back-to-back") sale agreement with its own buyer, or that the buyer was using the money from its own buyer to pay Sotheby's. (Crippa Decl. ¶ 16.)

27.     Pursuant to the Consignment Agreement, Crippa agreed to accept a price of $5 million. Sotheby's commission was to be any portion of the purchase price that exceeded the $5 million (together with certain reimbursable sale costs). (Crippa Decl. ¶ 17; Ex. 3 thereto at ¶¶ 1, 4.)

28.     A nonrefundable deposit of twenty percent was due by September 10, 2021, and the remainder was due ninety days after the buyer received Sotheby's sale invoice. Crippa understood that ninety days to expire in late November, 2021. (Crippa Decl. ¶ 18; Ex. 3 thereto at page 1.)

29.     The first payment was made ten days late on September 20, 2021, and final payment (which was never made in full) was not paid when due. (Crippa Decl. ¶ 19.)

30.     On February 18, 2022, Crippa signed an amendment to the Consignment Agreement, giving the buyer until February 28, 2022 to make another nonrefundable installment of $500,000, with the remainder due by March 22, 2022. (Crippa Decl. ¶ 20; Ex. 3 thereto.)

31.     The payments required under the amendment to the Consignment Agreement were not received. (Crippa Decl. ¶ 20.)

32.      Over the course of one year, Crippa received the following five payments from Sotheby's totaling $2,300,000 with respect to the sale of the Artwork: $1,000,000 on September 20 or 21, 2021; $800,000 on February 1 or 2, 2022; $300,000 on May 3, 2022; $100,000 on July 19, 2022; and $100,000 on September 21, 2022. (Crippa Decl. ¶ 21.)

33.     Despite the buyer's failure to pay the full purchase price, the Artwork has never been returned to Crippa as provided for by the Consignment Agreement, despite her repeated demands through counsel. (Crippa Decl. ¶ 22.)

34.     On October 18, 2023, through counsel, Crippa terminated Sotheby's authority to act on her behalf as agent, consignee or otherwise. (Crippa Decl. ¶ 23.)

35.     Crippa intervened into an existing lawsuit in New York State Court between Sotheby's and August Uribe Fine Art, LLC (*Sotheby's, Inc. v. August Uribe Fine Art, LLC*, Index No. 651350/2023, N.Y. County), seeking the Artwork and/or money damages from both parties. (Crippa Decl. ¶ 24.)

36.     Aside from the security interest that Third-Party Defendant Art Lending, Inc. now claims in the Artwork, at no time did anyone ever claim an ownership interest in it or otherwise contest Crippa's ownership or the authenticity of it. (Crippa Decl. ¶ 8.)

37.     At no time prior to or during the underlying events that gave rise to this lawsuit had Crippa ever previously heard of or had any contemporaneous dealings with August Uribe, August Uribe Fine Art, DartMilano SRL, Pier Giulio Lanza, Riccardo Manfrin, Maria Stellina Marescalchi, Fracassi Worldwide Shipping SRL, Oblyon Group LLC/Marco Mercanti or Art Lending, Inc. (Crippa Decl. ¶ 25.)

5

**II.    DART's financial statements and Art Lending's review thereof.**

38.    Defendant DARTMILANO SRL ("<u>DART</u>") filed its financial statements for 2020 with the Chamber of Commerce of Milan on or about July 29, 2021. (March 11, 2025 Decl. of Lionel Ceresi ("<u>Ceresi Decl.</u>") at ¶¶ 4, 9.)

39.    Those filed financial statements were publicly available. (Ceresi Decl. ¶ 9.)

40.    The filed financial statements of DART state that: it had a loss of 116,147 euros as of December 31, 2020; debts payable within the next fiscal year were 69,208 Euros; the debts payable beyond the next fiscal year were 169,748 euros; it had no commitments or guarantees; the total debts were 238,956 euros; and the total assets and liabilities were each 132,810 euros. (Ex. 1 to Ceresi Decl. at pages 4-5 of 19.)

41.    Art Lending was not aware of any obligation by DART under Italian law to file financing statements and had never seen the balance sheet filed by DART with the Chamber of Commerce of Milan. (November 14, 2024 Deposition of Christian Williams at 222:4-6, 223:6-14.)

42.    The assets and liabilities of DART set forth on its filed financial statements were dramatically less than those set forth on financial statements given by DART to ART Lending, and the former did not include an outstanding loan made by Art Lending in 2020. (*Id*. at 224:18-226:15.)

Dated: New York, New York
       March 11, 2025

Respectfully submitted,


FLOYD ZADKOVICH (US) LLP

By: /s/ Edward W. Floyd
      Edward W. Floyd
      Joseph Johnson

33 East 33rd Street, Suite 905
New York, New York 10016
ed.floyd@floydzad.com
Phone: (917) 999-6914
joe.johnson@floydzad.com
Phone: (917) 375-9511

*Attorneys for Intervenor-Plaintiff
Maria Iride Crippa*

7