**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AUGUST URIBE FINE ART, LLC,** | |
| *Plaintiff,* | |
| v. | |
| **DARTMILANO SRL, PIER GIULIO LANZA, RICCARDO MANFRIN, MARIA STELLINA MARESCALCHI, FRACASSI WORLDWIDE SHIPPING SRL, OBLYON GROUP, LLC, and ART LENDING, INC.,** | |
| *Defendants,* | |
| – and – | |
| **A CERTAIN ARTWORK** | |
| *Defendant-in-rem.* | |
| **SOTHEBY'S, INC.,** | **Civil Action No. 22-3104** |
| *Intervenor-Plaintiff,* | **OPINION** |
| v. | |
| **DARTMILANO SRL, PIER GIULIO LANZA, RICCARDO MANFRIN, and ART LENDING, INC.,** | |
| *Third-Party Defendants,* | |
| – and – | |
| **A CERTAIN ARTWORK** | |
| *Defendant-in-rem.* | |
| **MARIA IRIDE CRIPPA,** | |
| *Plaintiff,* | |
| v. | |
| **DARTMILANO SRL and ART LENDING, INC.,** | |
| *Third-Party Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Intervenor-Plaintiff Maria Crippa's ("Crippa") Motion for Summary Judgment, see ECF No. 225; Intervenor-Plaintiff Sotheby's, Inc.'s ("Sotheby's," and collectively with Crippa, "Plaintiffs") Motion for Summary Judgment, see ECF No. 241; and Third-Party Defendant Art Lending, Inc.'s ("Art Lending" or "Defendant") Motion for Summary Judgment, see ECF No. 238. Art Lending also moves in limine to "strike the testimony, certifications, or documents of Roberto Pacini and/or Ales[s]andro Zodo." ECF No. 238. Plaintiffs have each opposed Art Lending's Motions. See ECF No. 255; ECF No. 256. Art Lending has collectively opposed Plaintiffs' Motions. See ECF No. 249.9.

For the reasons stated below, Crippa's Motion is **GRANTED,** Sotheby's Motion is **GRANTED in part** and **DENIED in part**, Art Lending's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, and Art Lending's Motion in limine is **DENIED**.

## I.    FACTUAL BACKGROUND[1]

At its core, this case is about determining ownership of the Pablo Picasso painting Le Peintre (1967) (the "Artwork"). The Artwork was originally put up for sale by Crippa in August 2021. After the execution of four different agreements and the involvement of various players, it made its way into an art storage facility in New Jersey in an account owned by Art Lending. The Artwork remains in that same location today. But it has not been paid for in full.

---

[1] The Court draws the following facts from the Parties' statements of undisputed material facts. See ECF No. 237 ("Crippa SUMF"); ECF No. 242.1 ("Sotheby's SUMF"); ECF No. 238.1 ("Art Lending SUMF"). Where facts in a party's statement are supported by evidence in the record and denied by an opposing party without citation or conflicting evidence, the Court has deemed those facts undisputed. See Fed. R. Civ. P. 56(e)(2)–(3); Civ. L.R. 56.1(a); see Carita v. Mon Cheri Bridals, LLC, No. 10-2517, 2012 WL 2401985, at *3 (D.N.J. June 25, 2012). Uncontested facts based on hearsay have been considered where the Court has determined that the statements "are capable of being admissible at trial." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

Crippa seeks a declaratory judgment that she is the true owner of the Artwork and replevin of the Artwork. She moves for summary judgment on both claims.

Sotheby's also argues that Crippa is the true owner of the Artwork and that Art Lending and third-party Defendant Dartmilano SRL ("DART") have no interest in the Artwork. It further contends that pursuant to its own agreement with Crippa, it has a lien or other security interest in the Artwork. It seeks a separate declaratory judgment recognizing (1) that Sotheby's has a lien or other security interest in the Artwork, and (2) that DART and Art Lending have no interest in the Artwork, or if either does have an interest in the Artwork, that Sotheby's interest is superior. It moves for summary judgment on its claims.

Art Lending, for its part, claims to have a perfected senior security interest in the Artwork that is superior to any interest of any other parties in this proceeding, including Plaintiffs. It moves for summary judgment to confirm its ownership interest vis-à-vis the Plaintiffs and to dismiss Plaintiffs' complaints.

### A.    Crippa Obtains Title to the Artwork

In 2009, Alessandro Zodo sold the Artwork to Crippa's then-husband, Nicola Carlo Luciani. See Crippa SUMF ¶¶ 3–4. Luciani obtained full title to, and ownership of, the Artwork. See id.

In 2013, Crippa and Luciani separated. See id. ¶ 7. At that time, they executed a separation agreement under which Crippa became the owner of the Artwork. See id. They finalized their divorce two years later, and their divorce judgment confirmed that title to the Artwork passed from Luciani to Crippa. See id. ¶ 8.

### B.    Contractual Arrangements Establishing the Sale of the Artwork

On several occasions following her divorce, Crippa engaged Sotheby's, an art auction house, to market the Artwork to potential buyers. See id. ¶¶ 11, 17; see also Sotheby's SUMF

¶¶ 1, 23, 25.  In August 2021, August Uribe Fine Arts, LLC ("UFA"), a company founded to broker art deals by Sotheby's former employee, August Uribe, contacted Sotheby's about the Artwork.  See Sotheby's SUMF ¶¶ 3, 30–32.  Two art brokers, Jonatan Navarro and Maria Marescalchi, had previously made inquiries about the Artwork with Uribe and informed him that a "dynamic art museum" was interested in purchasing the Artwork.  See id. ¶¶ 6, 27–29; see also Decl. of August Uribe ("Uribe Decl."), at ¶¶ 6–7.  That museum was DART, which was founded in 2020 by Pier Guilio Lanza and Riccardo Manfrin to obtain art from private collectors for display on a digital platform.  See Sotheby's SUMF ¶¶ 5–6, 8–9.  Marescalchi was DART's agent.  See Uribe Decl. ¶ 7; see also Uribe Decl., Ex. 4 (email from Lanza explaining Marescalchi was responsible for verifying all aspects of UFA's and DART's agreement for the Artwork on DART's behalf).

Ultimately, the various parties arranged a multi-step sale for the Artwork.  At the first step, on August 24, 2021, Crippa and Sotheby's entered into a Private Sale Agreement (the "Crippa-Sotheby's Agreement").  Under its relevant terms:

- Crippa retained Sotheby's as her agent to offer the Artwork for sale, see Sotheby's SUMF ¶ 38;
- Sotheby's could "temporarily loan the [Artwork] to the Buyer prior to Buyer's payment of the Purchase Price," id. ¶ 41;
- Sotheby's had to sell the Artwork for a purchase price of at least $5 million, which could be collected in two installments, and was entitled to any amount in excess of the purchase price as commission, see id. ¶¶ 38–40; and
- Crippa would retain title until Sotheby's received full payment for the Artwork, see id. ¶ 41 ("Title to the [Artwork] shall only pass to the Buyer upon [Sotheby's] receipt of full payment of the Purchase Price in full and cleared funds.").

At the second step, on the same day the Crippa-Sotheby's Agreement was executed, Sotheby's also entered into a Private Purchase Agreement for the Artwork with UFA (the "UFA-Sotheby's Agreement").  Under its relevant terms:

- Sotheby's agreed to transfer the Artwork to UFA under the terms of a "temporary loan . . . for viewing purposes," Decl. of Phillip S. Rosen In Support of Motion ("Rosen Decl."), Ex. 3 at 3;

- While on loan, UFA agreed:  (1) to hold the Artwork at Aiston Fine Art Services, a storage facility run by Mark Aiston in Long Island City, NY (the "NY Warehouse"); (2) not to "remove [the Artwork] from such premises"; and (3) to indemnify Sotheby's "during the period for which the [Artwork] is on loan," id.;

- UFA agreed to pay $5.5 million for the Artwork in two installments, see Sotheby's SUMF ¶¶ 47–48; and

- Crippa would retain title until Sotheby's received full payment for the Artwork, see id. ¶ 52 ("Title to the [Artwork] will pass to [UFA] when [Sotheby's] receive[s] full payment of the Purchase Price in cleared funds.").

UFA had previously informed Sotheby's that it intended to resell the Artwork, but did not identify its buyer, DART.  See Sotheby's SUMF ¶¶ 33, 35.

At the third step of the sale, UFA and DART entered a separate Private Agreement for the Sale of Artwork (the "UFA-DART Agreement").  Under its relevant terms:

- The parties agreed to address issues related to the "Handling and Storage" and "Purchase" of the Artwork, Rosen Decl., Ex. 2 at 2;

- UFA represented that it had "full availability and title to . . . the Artwork," id. at 3;

- The Artwork would be "transported within August 25th by Fracassi Worldwide Shipping and h[e]ld under your name in his facility at" the NY Warehouse, see Sotheby's SUMF ¶ 58;

- DART agreed to pay $6.3 million for the Artwork in two installments, see id. ¶ 56; and

- UFA would retain title until it received full payment for the Artwork, id. ¶ 60 ("[UFA] will remain the legitimate and sole owner of the Artwork until the crediting of the balance amount," i.e., until payment in full).

DART drafted the UFA-DART Agreement.  See Decl. of Mana Ameri in Support of Sotheby's, Inc.'s Motion for Summary Judgment ("Ameri Decl."), Ex. 1 at 7.  UFA therefore understood the reference to "your name" to refer either to Uribe or UFA.  See Sotheby's SUMF ¶ 59.  And it understood "his facility" to be a reference to Aiston's facility, the NY Warehouse.  Id.  Because the Artwork would be held in UFA's name, and because Aiston was acting as an agent for UFA, UFA believed that it would retain control of the Artwork vis-à-vis

DART until payment was received in full.  See Uribe Decl. ¶ 20.  UFA also informed DART that it did not have the funds to pay for the Artwork itself and would therefore be relying on the funds DART agreed to pay to complete its own purchase of the Artwork.  See Sotheby's SUMF ¶ 61; Uribe Decl. ¶ 14.

### C.    DART's Intent to Use the Artwork as Collateral to Support a Loan

Unbeknownst to UFA, DART intended to use the Artwork as collateral for a loan it applied for from Art Lending.  See Sotheby's SUMF ¶ 83.  In 2019, an investment firm called Shinnecock Partners founded Art Lending "to offer its investors art lending opportunities."  Id. ¶ 4.  Art Lending had previously issued DART four loans.  See id. ¶ 82.  In July 2021, it agreed to issue DART a fifth loan valued at $14.6 million (the "DART Loan").  See id. ¶ 83.  The DART Loan was secured by eight pieces of collateral, including the Artwork.  See id. ¶ 104.

On September 8, 2021, DART and Art Lending executed the Loan and Security Agreement governing the DART Loan.  See id. ¶ 103.  Art Lending also informed DART that it would not disburse any money under the DART Loan until it possessed the Artwork.  See id. ¶ 108.

### D.    The Artwork Is Moved—And Then Moved Again, and Again, and Again, Ultimately Arriving in Art Lending's Account in a New Jersey Warehouse

Per the Crippa-Sotheby's Agreement, the Artwork was initially transferred to, and held by, Sotheby's.  See Decl. of Maria Iride Crippa ("Crippa Decl."), Ex. 3 at 3; Ameri Decl., Ex. 1 at 8.  On August 25, 2021, Sotheby's transferred the Artwork to the NY Warehouse to be held by UFA under "temporary loan."  Sotheby's SUMF ¶¶ 49, 112; Uribe Decl. ¶ 26.  Two days later, Marescalchi contacted UFA.  See Uribe Decl. ¶ 27.  She requested that UFA move the Artwork to SRI Fine Art Services' art storage warehouse in Clifton, New Jersey ("NJ Warehouse") because "DART wanted to be able to view the Artwork at the same facility . . . where other works purchased by DART with donated funds were also to be viewed."  Id.

6

Unbeknownst to Sotheby's, UFA then coordinated with Aiston to have the Artwork moved from the NY Warehouse to the NJ Warehouse. See Sotheby's SUMF ¶ 113. UFA believed that the Artwork was being moved for viewing and inspection by DART.[2] Aiston held the same belief.[3] So did the SRI employee at the NJ Warehouse who was coordinating the transfer.[4] The Artwork was going to be moved into and held under Aiston's account at the NJ Warehouse. See Sotheby's SUMF ¶ 113. Therefore, Aiston told UFA that despite the change in geographic location, it was "as if [the Artwork's] still in my [NY Warehouse]." Id.

On August 30, 2021, the Artwork arrived at the NJ Warehouse and was placed in Aiston's account. See id. The next day, Marescalchi told UFA that DART "would not pay unless the painting was released to the shipper that was authorized to hold the painting," Fracassi Worldwide Shipping ("Fracassi"). Sotheby's SUMF ¶ 115; Uribe Decl., Ex. 3 at 7. Before complying with this request, Aiston asked Fracassi to "explain their 'account.'" Uribe Decl., Ex. 3 at 7. Fracassi informed Aiston that it had its own account at the NJ Warehouse, that DART did not have an account, and that the painting would be moved into its account. See Uribe Decl. ¶ 29 (noting Fracassi explained to Aiston it had its own account at the NJ Warehouse, that there was "not [a] buyer account," and that Fracassi would store the Artwork "as against their client"). With this

---

[2] See Uribe Decl., Ex. 3 at 1 (UFA asking Aiston "when the museum board [i.e., DART] viewing will take place"); id. at 4 (UFA telling Aiston it hopes "the inspection goes well"); id. (UFA stating it may not receive payment "until the Picasso is physically inspected").

[3] See Uribe Decl., Ex. 3 at 5 (Aiston informing UFA the Artwork would be "received and condition reported by SRI and then re-crated and placed in [Aiston's] storage area"); Decl. of Deborah Correa White ("White Decl."), Ex. 1 at 8 (Aiston informing an SRI employee "the prospective new owners will be wanting to view this work as soon as possible"); id. (Aiston informing SRI employee that UFA "might accompany me at a viewing"); id. at 6 (Aiston asking SRI employee to please inform him "when your client wishes to examine [the Artwork]").

[4] See White Decl., Ex. 1 at 8 (SRI employee telling Aiston he "can be present at the viewing"); id. at 7 (SRI employee informing Aiston that DART "only wants [SRI] to do a condition report on the work"); id. at 5 (SRI employee informing Aiston the Artwork "will more than likely be inspected today as soon as [SRI] receives it").

information, UFA authorized Aiston to move the Artwork from Aiston's account to Fracassi's account "with the proviso that [Fracassi] cannot move the picture outside of [the NJ Warehouse] until it has been paid for in full." Sotheby's SUMF ¶ 118. Fracassi, in turn, assured Aiston that the Artwork would "remain at [the NJ Warehouse]." Uribe Decl. ¶ 29. With these assurances, on September 1, 2021, Aiston had the Artwork moved to Fracassi's account. See Sotheby's SUMF ¶ 117.

Unbeknownst to UFA or Aiston, Fracassi had been communicating with Oblyon Group, LLC ("Oblyon") and DART. See Rosen Decl., Ex. 23. Oblyon was an agent of DART that facilitated DART's various loan agreements with Art Lending. See Reply Decl. of Philip S. Rosen ("Rosen Reply Decl."), Ex. 37 at 2; Sotheby's SUMF ¶¶ 67, 109. Before Fracassi's conversation with Aiston on August 31, Fracassi, Oblyon, and DART had already discussed moving the Artwork from Fracassi's account into Oblyon's account once Fracassi obtained it. See Rosen Decl., Ex. 23. On the same day that UFA and Aiston agreed to and moved the Artwork into Fracassi's account, Fracassi wasted no time and immediately moved the Artwork into Oblyon's account. See Sotheby's SUMF ¶ 123. UFA did not know about Oblyon, its relationship with DART, or that an agent of DART had an account at the NJ Warehouse, and the Artwork was moved without UFA's knowledge or authorization. See Uribe Decl. ¶ 31; Sotheby's SUMF ¶ 123.

Two days later, on September 3, 2021, Art Lending filed a Uniform Commercial Code ("UCC") Statement recognizing its purported security interest in the Artwork and the other collateral associated with the DART Loan. See Sotheby's SUMF ¶ 101. One week later, on September 9, 2021, Oblyon had the Artwork moved into Art Lending's account at the New Jersey Warehouse. See id. ¶ 125. Art Lending then dispensed $11.6 million of the DART Loan to DART. See id. ¶¶ 109–11.

### E.      The Artwork Is Not Paid for In Full, and Litigation Ensues

Ultimately, payment did not follow the terms established by the Crippa-Sotheby's Agreement, UFA-Sotheby's Agreement, or UFA-DART Agreement.  Instead of completing payment in two installments as originally contemplated, DART made six separate payments to UFA between September 2021 and September 2022, and it only paid $2.727 million of the $6.3 million it owed.  See Sotheby's SUMF ¶¶ 127, 130–31, 140, 143, 146; Uribe Decl. ¶ 33.  UFA made four payments to Sotheby's during this same time period, and paid $2.3 million of the $5.5 million it owed.  See Sotheby's SUMF ¶¶ 126–27, 132, 141, 144, 148; Uribe Decl. ¶ 33.  Sotheby's made five payments to Crippa, and paid the full $2.3 million it received out of the $5 million it owed.  See Sotheby's SUMF ¶¶ 128, 133, 142, 145, 147, 148.

In February 2022, after only receiving a fraction of the payment it was owed from DART, UFA contacted Aiston and advised him that it may need him to retrieve the Artwork from the NJ Warehouse.  See Sotheby's SUMF ¶ 134.  Aiston contacted the NJ Warehouse, only to learn that the Artwork had been moved from Fracassi's account to Oblyon's account, and then to Art Lending's account.  See id. ¶ 135; Uribe Decl. ¶ 38.  The NJ Warehouse refused to release the Artwork to Aiston without Art Lending's consent.  See Sotheby's SUMF ¶ 135.

At around the same time, UFA contacted DART to address the outstanding payments.  See Uribe Decl. ¶ 40.  In response, Lanza acknowledged that he was aware UFA was representing a "collector . . . in the sale of the" Artwork.  Id.  He also stated he hoped they could reach a settlement that would allow them to "complete the deal."  Uribe Decl., Ex. 4 at 1.  In March 2022, UFA and DART executed a Payment and Standstill Agreement ("Standstill Agreement") that amended the UFA-DART Agreement and established a new payment schedule for the Artwork.  See Sotheby's SUMF ¶ 138.  DART failed to fully comply with its terms.  See id. ¶¶ 140, 143, 146, 148.

## II.    PROCEDURAL HISTORY

On May 26, 2022, UFA initiated this action against DART, its various agents and principles, and Art Lending.  See ECF No. 1.  In response to motions to dismiss that were filed, the District Court permitted UFA's claim for fraud against DART, Manfrin, and Lanza, and its claim for conspiracy against DART, Manfrin, Lanza, and Oblyon, to proceed.  It dismissed all other challenged claims.[5]  See generally ECF Nos. 57, 58.

In October 2023, Sotheby's filed a motion to intervene in this action.  See ECF Nos. 84, 95.  In June 2024, while that motion remained pending, Crippa filed a separate motion to intervene.  See ECF Nos. 127, 133.  The Court granted both motions.  See ECF No. 147.  They have brought claims against DART, Manfrin, Lanza, and Art Lending.  See ECF Nos. 148, 155.[6]

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the Court will grant a motion for summary judgment if the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Scanlan v. Am. Airlines Grp., 102 F.4th 164, 170 (3d Cir. 2024).  A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020).  "A fact is material if 'it might affect the outcome of the suit under the governing law.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The Court construes all facts and inferences in the light most favorable to

---

[5] These motions did not seek to specifically dismiss the breach of contract claim against DART, Lanza, and Manfrin.  See ECF No. 8.  That claim therefore remains pending.  UFA separately voluntarily dismissed its claims against Marescalchi and Art Lending.  See ECF Nos. 81, 111.

[6] In May 2023, prior to intervening in this action, Sotheby's initiated a separate state court proceeding in New York against UFA related to the Artwork.  See Sotheby's SUMF ¶ 151.  Crippa also intervened in that proceeding.  See id. ¶ 153.  It remains pending.

the non-moving party.  See id.  At the summary judgment stage, the Court's role is not to weigh

the evidence or determine the ultimate truth of the allegations.  See Baloga v. Pittston Area Sch.

Dist., 927 F.3d 742, 752 (3d Cir. 2019).

## IV.    DISCUSSION[7]

These Motions seek an answer to a simple question:  Who has title to, and therefore owns,

the Artwork?  To answer that question, the Court's analysis focuses on two provisions of the

Uniform Commercial Code ("UCC") that govern the transfer of title: § 2-401 and § 2-403.[8]

---

[7] In an action premised on diversity jurisdiction, the Court applies the choice-of-law rules of the forum state to determine which state's substantive law applies.  Carrow v. Fedex Ground Package Sys., Inc., No. 16-3026, 2017 WL 1217119, at *3 (D.N.J. Mar. 30, 2017).  In contract disputes, New Jersey's choice of law rules "generally uphold[] choice-of-law clauses."  Id. at *3.  But if the choice-of-law clause does not clearly apply and the dispute implicates the interests of multiple forums, New Jersey courts use the "most significant relationship test."  Id. at *4.  Under this standard, the Court first determines whether an "actual conflict exists between the laws of the two states, which is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them."  Id. (quotation marks omitted).  If there is no conflict, the court applies the law of the forum state.  See id.

The parties' dispute under UCC § 2-401 requires the Court to interpret the Crippa-Sotheby's Agreement and the UFA-Sotheby's Agreement.  Both contain choice-of-law clauses stating each will be governed by New York law.  See Sotheby's SUMF ¶¶ 43, 53.  Therefore, the Court primarily applies New York law to its interpretation of these agreements and its assessment of the issues raised under § 2-401.  See Carrow, 2017 WL 1217119, at *3.

The Parties' dispute under UCC § 2-403 requires interpreting the UFA-DART Agreement.  The Standstill Agreement, which amended the UFA-DART Agreement, contains a choice-of-law clause stating that the UFA-DART Agreement will be governed by New Jersey law.  See Sotheby's SUMF ¶ 139.  However, resolving this dispute also requires determining whether Sotheby's sold the Artwork to a "buyer in the ordinary course of business," which involves consideration of events surrounding the transfer of the Artwork from the NY Warehouse to the NJ Warehouse.  That implicates both forums and counsels against immediate deference to the Standstill Agreement's choice-of-law clause.  The adopted versions of § 2-403 in New York and New Jersey are identical, and the Parties have not identified any dispute in each state's caselaw interpreting these provisions, so there is no actual conflict between the law in each forum.  Therefore, the Court primarily applies New Jersey law to its resolution of the issues raised under § 2-403.  See Carrow, 2017 WL 1217119, at *4.

The Court primarily applies New York and New Jersey law as specified above.  As with § 2-403, the adopted versions of § 2-401 are identical in both jurisdictions.  So are all other UCC provisions analyzed in this Opinion.  Many other states have also adopted identical versions of the relevant UCC provisions.  Caselaw in New York and New Jersey interpreting §§ 2-401 and 2-403 is at times conflicting or unclear about how to resolve certain relevant issues, and the Parties have not identified any decision from either jurisdiction's highest court definitively resolving or addressing these issues.  Because "one of the purposes of the UCC is to foster nationwide uniformity in the application of commercial law, cases from other jurisdictions interpreting the Code should be given substantial weight."  Lakes Gas Co. v. Clark Oil Trading Co., 875 F. Supp. 2d 1289, 1305 (D. Kan. 2012) (citation omitted); accord On Air Ent. Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000) (explaining where no conflict exists between state laws, a court may "refer interchangeably to the laws of [the relevant states] in discussing the law applicable to the case").  The Court has therefore turned to cases in other jurisdictions to assist in its interpretation of the relevant UCC provisions.

[8] The Court denies the request to strike the certifications of Roberto Pacini and Alessandro Zodo.  See ECF No. 238.  Both witnesses were disclosed, though belatedly, by the fact discovery deadline.  See Art Lending SUMF ¶¶ 75–76; ECF Nos. 163, 208.  And at this juncture the Court will not exclude these declarations under Federal Rule of Evidence 403 because they are relevant and not prejudicial.

## A.    UCC § 2-401 and the Title-Retention Provisions

The Crippa-Sotheby's Agreement, the UFA-Sotheby's Agreement, and the UFA-DART Agreement each contained title-retention provisions that specified that title to the Artwork would only pass upon the seller's receipt of full payment.  However, Art Lending argues that under UCC § 2-401, parties cannot contract to prevent the passing of title from a seller to a buyer after delivery. It further argues that delivery occurred here between Sotheby's and UFA when the Artwork was transferred to the NY Warehouse, and delivery occurred between UFA and DART when the Artwork was transferred to the NJ Warehouse.  Title, therefore, was passed to UFA and then to DART by virtue of § 2-401, notwithstanding the title-retention provisions.

Plaintiffs, on the other hand, argue that delivery requires an intent to surrender control over and transfer title to a good, and such intent was absent here because Sotheby's only transferred the Artwork to UFA under the terms of a temporary loan.  Because this transfer did not constitute delivery between Sotheby's and UFA, title never transferred from Crippa to UFA.    Without title to the Artwork, UFA could not then transfer title to DART.  And without delivery, and hence the passing of title, the title-retention provisions govern.  Under the terms of those provisions, title remains with Crippa.

The Court agrees with Plaintiffs.

### 1.    Defining "Delivery" Under UCC § 2-401.

Section 2-401, in relevant part, states as follows:

- "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions . . . title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." N.Y. U.C.C. § 2-401(1) (2024).

- "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though

a document of title is to be delivered at a different place or time." N.Y. U.C.C. § 2-401(2) (2024).

- "Unless otherwise explicitly agreed where delivery is to be made without moving the goods, if the seller is to deliver a tangible document of title, title passes at the time when and the place where he delivers such documents." N.Y. U.C.C. § 2-401(3)(a) (2024).

The UCC does not define delivery in relation to tangible "goods" like the Artwork. See N.Y. U.C.C. § 2-105(1) (2024) (defining "goods" as "all things which are movable at the time of identification to the contract for sale"). It does, however, define delivery in relation to a narrower set of tangible items: financial instruments, documents of title, and chattel paper. With respect to these items, delivery is defined as a "voluntary transfer of possession." N.Y. U.C.C. § 1-201(15).

The same "words and phrases within the same statute should normally be given the same meaning." Monsalvo v. Bondi, 145 S. Ct. 1232, 1242 (2025) (quotation marks omitted). This is "doubly appropriate" where the legislature has "employed the same terms in multiple places at the same time in the same section of the same public law." Id. (cleaned up); see also Laurel Gardens LLC v. McKenna, No. 23-2649, 2024 WL 3220401, at *3 (3d Cir. June 28, 2024) (recognizing that "[i]n a given statute, the same term usually has the same meaning" (quotation marks omitted)); Hanif v. Att'y Gen. of U.S., 694 F.3d 479, 484 (3d Cir. 2012) (explaining that courts "presume that the same term has the same meaning when it occurs here and there in a single statute" (quotation marks omitted)).

Here, this interpretive principle applies. Sections 2-401(1) and 2-401(2) govern the transfer of title in relation to all tangible goods. Section 2-401(3) governs the transfer of title in relation to tangible documents of title. The UCC defines "delivery" in relation to the latter. Presumably, the legislature's use of the word delivery in sub-provisions (1) and (2)—the "same term" employed in "multiple places" in the "same section of the same public law"—carries the same defined meaning that it has in sub-provision (3). Monsalvo, 145 S. Ct. at 1242.

14

Delivery, in the context of UCC §§ 2-401(1) and (2), therefore means the "voluntary transfer of possession." Voluntary means "[d]one by design or intention." See Black's Law Dictionary (12th ed. 2024). Transfer, invoked as a verb in this definition, means "to pass or hand over from one to another, esp[ecially] to change over the possession or control of." Id. Possession means "the right under which one may exercise control over something to the exclusion of all others." Id. Putting these terms together, "delivery" means the handing over of a good from a seller to a buyer where the seller also intends for the buyer to take its right to control the good to the exclusion of all others, including the seller. That, in turn, means seller intends to relinquish any right to recover the good after handing it over. If the seller makes clear that the passing of the good at issue does not represent the seller's intention to relinquish its control over the good, "delivery" has not yet occurred.

Other courts have similarly defined delivery under identical versions of § 2-401. See, e.g., Am. State Bank of Olivia v. Ladwig & Ladwig, Inc., 646 N.W.2d 241, 246 (Minn. Ct. App. 2002) ("Delivery requires that the seller intend to relinquish control over the goods to the buyer by placing them at the buyer's disposal."); Joseph Heiting & Sons v. Jacks Bean Co., 463 N.W.2d 817, 823 (Neb. Ct. App. 1990) ("Delivery occurs when the seller does everything necessary to put goods completely and unconditionally at the buyer's disposal."); Humberto Decorators, Inc. v. Plaza Nat'l Bank, 434 A.2d 618, 620 (N.J. Super. Ct. App. Div. 1981) (explaining that "[t]he matter of intention is vital to delivery" and that delivery of a check therefore occurred when the defendant "surrendered control" of the check to the plaintiff's purported agent (quotation marks omitted)).[9] And courts have found that a transfer of a good from a seller to a buyer did not

---

[9] The Parties also similarly define delivery. See, e.g., ECF No. 242 at 33–34 (Sotheby's arguing delivery means "a desire to surrender control over and transfer title" of a good); ECF 259.8 at 13–14 & n.8 (Art Lending arguing delivery occurred because Sotheby's, UFA, and DART "voluntarily delivered and transferred possession of the Artwork").

constitute "delivery" where the terms of the transfer made it clear the seller had not relinquished its control over the good. See, e.g., Goldstein v. Olympus Optical Co., Ltd., 98 A.D.2d 991, 991 (N.Y. App. Div. 1983), aff'd, 473 N.E.2d 764 (N.Y. 1984) (holding that delivery had not occurred where goods were sent from the seller to a warehouse to be "maintained" by the buyer but the decision to release the goods from the warehouse remained within the "control of" the seller); Matter of Alofs Mfg. Co., 209 B.R. 83, 96–97 (Bankr. W.D. Mich. 1997) (holding that delivery had not occurred when goods were sent from the seller to the buyer "for testing purposes" and where the parties agreed the goods would be returned to seller "regardless of the outcome of the tests"). Thus, this Court must assess each party's intent before transferring the Artwork to determine whether delivery occurred.

### 2.    Delivery Never Occurred Between Sotheby's and UFA.

Here, to determine whether there was delivery between Sotheby's and UFA, the Court looks to both parties' intent and conduct, which is found within and which was based on the terms of the UFA-Sotheby's Agreement.[10]

The principles of contract interpretation are "well established." Donohue v. Cuomo, 184 N.E.3d 860, 866 (N.Y. 2022). It represents "an issue of law within the province of the court." Estate of Hatch v. Nyco Mins., Inc., 245 A.D.2d 746, 747 (N.Y. App. Div. 1997). A contract must be interpreted "in accord with the parties' intent," and the "best evidence of what the parties intend is what they say in their writing." Donohue, 184 N.E. 3d at 866 (quotation marks omitted). If the writing is "complete, clear and unambiguous on its face," it "must be enforced according to the

---

[10] There could not be any "delivery" between Crippa and Sotheby's because Sotheby's was retained as Crippa's agent to offer the Artwork for sale and acted within the scope of its authority. See Sotheby's SUMF ¶ 38. "[T]he acts of agents . . . while acting within the scope of their authority are presumptively imputed to their principals." Kirschner v. KPMG LLP, 938 N.E.2d 941, 950 (N.Y. 2010). In other words, Sotheby's acted in the shoes of Crippa. Their actions are therefore one in the same.

plain meaning of its terms" and "matters extrinsic to the agreement may not be considered." Westchester Cnty. Corr. Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester, 99 A.D. 3d 998, 999 (N.Y. App. Div. 2012) (quotation marks omitted). A contract is unambiguous "if the language it uses has a definite and precise meaning" and presents "no reasonable basis for a difference of opinion." Donohue, 184 N.E.3d at 867. Ambiguity does not arise from silence; it only arises if the language included in the contract "was written so blindly and imperfectly that its meaning is doubtful" and "susceptible of two reasonable interpretations." Id. at 866–67. The contract's language must be interpreted "as a whole." Arista Dev., LLC v. Clearmind Hldgs., LLC, 207 A.D.3d 1127, 1128 (N.Y. App. Div. 2022) (quotation marks omitted).

The plain language of the UFA-Sotheby's Agreement governing the transfer of the Artwork is unambiguous. Sotheby's agreed to transfer the Artwork to UFA as part of a "temporary loan" for "viewing purposes." Rosen Decl., Ex. 3 at 3. By its plain language, this means Sotheby's agreed to permit UFA to receive and hold the Artwork for a limited time so UFA could view it and its condition. Because the transfer was only a "loan," Sotheby's did not "surrender" or "relinquish" control of the Artwork. Am. State Bank, 646 N.W.2d at 246; Humberto, 434 A.2d at 620. Instead, as the ordinary understanding of a "loan" implies, it was permitting UFA to briefly borrow the Artwork and retained the right to take it back. This conclusion is further buttressed when interpreting the Agreement "as a whole," Arista, 207 A.D.3d at 1128, which repeatedly defined the transfer as a "loan," see Rosen Decl., Ex. 3 at 3 (stating that UFA agreed to indemnify Sotheby's "during the period for which the [Artwork] is on loan" and to provide a statement showing insurance coverage "in effect for the dates of the loan provided herein").

In short, under the plain terms of the UFA-Sotheby's Agreement, the transfer from Sotheby's to UFA did not represent Sotheby's intent to relinquish its control over the painting. It therefore does not constitute delivery under UCC § 2-401.

> **3.    Because Delivery Never Occurred Between Sotheby's and UFA, Title to the Artwork Never Passed From Sotheby's to UFA or From UFA to DART.**

Without delivery between Sotheby's and UFA, UFA obtained no interest in the Artwork that could subsequently be transferred to DART under § 2-401. Generally, a "purchaser of goods acquires all title which [the] transferor had or had power to transfer." See N.Y. U.C.C. § 2-403(1) (2024); see also Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982, 790 F. Supp. 3d 247, 281 (S.D.N.Y. 2025) (explaining that a purchaser "can acquire only the title which is held by the seller and that the seller is able to transfer"); Overton v. Art Fin. Partners LLC, 166 F. Supp. 3d 388, 399 (S.D.N.Y. 2016) (same). In other words, where a purchaser never acquires title itself, it generally cannot pass that title to any other party in a subsequent sale. But see infra § IV. B.

Here, the transfer between Sotheby's and UFA did not constitute delivery. Therefore, the title-retention provision in the UFA-Sotheby's Agreement dictated the terms under which title would pass. It stated Crippa's "[t]itle to the [Artwork] w[ould] pass to [UFA] when [Sotheby's] receive[d] full payment of the Purchase Price in cleared funds." Sotheby's SUMF ¶ 52. It is undisputed that UFA never fully paid Sotheby's the agreed upon Purchase Price of $5.5 million. See id. ¶¶ 126–27, 132, 141, 144, 148; Uribe Decl. ¶ 33. Therefore, title did not pass from Crippa to UFA under the plain terms of the UFA-Sotheby's Agreement.

Because title never passed to UFA, UFA had no title or other ownership interest that it could pass to DART. See N.Y. U.C.C. § 2-403(1); Athena, 790 F. Supp. 3d at 281. DART therefore could not obtain title pursuant to § 2-401. See Ameri Decl., Ex. 37, Djhon v. "Femme

Assise, 1958," By Pablo Picasso, In Rem, No. PAS-C-118-22, at *7, *9 (N.J. Super. Ct. Ch. Div. June 24, 2024) (holding that where title to a painting was never acquired by a purchaser, the purchaser "could not have passed any right in the painting" in a subsequent sale to DART, and there was therefore "no evidence of an ownership interest by" DART).

### B.    UCC § 2-403 and the Merchant Entrustment Rule

In the alternative, Art Lending argues that DART obtained title to the Artwork pursuant to UCC § 2-403(2), or the "merchant entrustment rule" ("MER"). Overton, 166 F. Supp. 3d at 400. In its telling: Crippa entrusted the Artwork to Sotheby's; Sotheby's entrusted the Artwork to UFA, an art merchant; and UFA sold the Artwork to DART, a buyer in the ordinary course of business. UFA therefore could—and did—transfer the rights of the original owner, Crippa, to its buyer, DART. Plaintiffs counter, inter alia, that DART is not a buyer in the ordinary course of business and therefore could not acquire title under the MER. The Court agrees with Plaintiffs.

The MER "requires three separate parties—an owner, a merchant, and a buyer," and "only applies when a rightful owner attempts to sue a buyer after the buyer purchases goods from a merchant." Great Am. Ins. Co. v. Nextday Network Hardware Corp., 73 F. Supp. 3d 636, 641 (D. Md. 2014). It was "designed to enhance the reliability of commercial sales . . . by shifting the risk of resale to one who leaves property with" a merchant and, in doing so, "assumes the risk of the merchant's acting unscrupulously by selling the property to an innocent purchaser . . . with the ability to transfer the property with apparent good title." Graffman v. Espel, No. 96-8247, 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) (emphasis added).

Importantly, however, unlike under § 2-401, where a seller has good title that it transfers to a buyer upon the terms of the parties' agreement or at the point of delivery, under § 2-403 a person entrusted with the good (referred to as an "entrustee") only has apparent good title, or "voidable title," that can be transformed into "good title." Overton, 166 F. Supp. 3d at 400; see

19

also D.C. v. Powers Gallery, Inc., 335 A.2d 244, 247 n.4 (D.C. 1975) (explaining that an entrustee has no "incident of ownership" over the goods).  This transformation occurs if three circumstances are satisfied:  (1) an owner entrusts her goods, (2) to a "merchant who deals in goods of the kind," (3) who then sells the goods to a "buyer in the ordinary course of business."  N.J.S.A 12A:2-403(2); see also Touch of Class Leasing v. Mercedes-Benz Credit of Canada, 591 A.2d 661, 668 (N.J. Super. Ct. App. Div. 1991).

A "buyer in the ordinary course of business" means "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods." N.J.S.A. 12A:1-201(9).  "Good faith," in turn, means purchasing goods with "honesty in fact and the observance of reasonable commercial standards of fair dealing."  Id. §1-201(20).  Whether a buyer has acted with honesty in fact must "be viewed subjectively."  Nissan Motor Acceptance Corp. v. Sports Car Leasing LLC, 529 F. Supp. 3d 371, 384 (E.D. Pa. 2021) (citing Hartford Accident Indem. Co. v. First Pa. Bank, Nat'l Ass'n, 859 F.2d 295, 297 (3d Cir. 1988)).  If the buyer is itself a merchant, it is held to a heightened standard of good faith and "must inquire into the provenance or ownership of the merchandise [being sold] where there are 'warning signs' or 'red flags' indicating problems with the sale."  Overton, 166 F. Supp. 3d at 401 (quotation marks omitted); see also Touch of Class Leasing, 591 A.2d at 670 (similar).  Certain red flags include "whether the buyer was aware of the seller's financial difficulties" or "whether the buyer would have reason to doubt the seller's ownership of the artwork."  Overton, 166 F. Supp. 3d at 401 (quotation marks omitted).  If a buyer "proceeds to purchase artwork from another dealer in the presence of such red flags, without making a diligent inquiry as to the provenance of the work in question," it will not qualify as a buyer in the ordinary course of business.  Id. (quotation marks omitted).

The Court concludes that DART cannot be considered a "buyer in the ordinary course of business" for two independent reasons: (1) DART was not "honest in fact" with UFA throughout the transaction for the Artwork; and (2) DART had reason to doubt UFA's ability to pay for, and UFA's ownership interest in, the Artwork.

> **1.    DART Was Dishonest With UFA When Arranging the Transfer of the Artwork from New York to New Jersey.**

In arranging the transfer of the Artwork from the NY Warehouse to the NJ Warehouse, DART deceived UFA. It was not honest about why it was requesting the Artwork be moved to the NJ Warehouse. And it was not honest about how the Artwork would be stored once at the NJ Warehouse.

First, UFA was told that the Artwork was being moved for viewing purposes. DART, however, intended to move the Artwork to transfer it into Art Lending's account at the NJ Warehouse to obtain the funds from the DART Loan. Marescalchi, acting as DART's agent, misleadingly or falsely represented to UFA that DART wanted the Artwork moved to the NJ Warehouse "to view the Artwork at the same facility . . . where other works purchased by DART with donated funds were also to be viewed." See Uribe Decl. ¶ 27; see also Sotheby's SUMF ¶ 115. Because this inquiry must "be viewed subjectively," the beliefs of the individuals involved in the transfer of the Artwork are highly relevant. Nissan, 529 F. Supp. 3d at 384. Those beliefs confirm that UFA and its agent Aiston believed what DART represented: that the Artwork was being moved for viewing and inspection purposes only. See supra at 7 n.2–3. So did the SRI employee at the NJ Warehouse coordinating the transfer with Aiston and Fracassi. See supra at 7 n.4. In other words, at no point did UFA believe that by completing this requested transfer it was relinquishing its control over the Artwork to DART.

21

That belief is reinforced by the initial storage arrangement UFA set up for the Artwork. When first moved, the Artwork was placed in its agent, Aiston's, account.  See Sotheby's SUMF ¶ 13.  DART then informed UFA it would not pay unless the Artwork was moved into Fracassi's account.  See id. ¶ 115.  Before complying, UFA and Aiston sought clarity and asked Fracassi to "explain their 'account.'"  Uribe Decl., Ex. 3 at 7.  Fracassi assured Aiston:  (1) that it had its own account at the NJ Warehouse; (2) that there was "not [a] buyer account;" (3) that the Artwork would be held "as against their client," DART; and (4) that the Artwork would "remain at [the NJ Warehouse]."  Uribe Decl. ¶ 29.  UFA had no reason to doubt Fracassi's representations based on the plain terms of the UFA-DART Agreement.   The Agreement itself only addressed the "Purchase" and "Handling and Storage" of the Artwork.  Rosen Decl., Ex. 2 at 2.  It did not address delivery.  See generally id.  And it designated Fracassi as a neutral shipper that would facilitate the "Handling and Storage" elements of the Agreement, which involved moving the Artwork into the hands of UFA's agent, Aiston, not into the hands of DART.  Id. at 2.  UFA therefore agreed to have the Artwork moved into Fracassi's account "with the proviso that [Fracassi] cannot move the picture outside of [the NJ Warehouse] until it has been paid for in full."  Sotheby's SUMF ¶ 118.

But DART was dishonest about why it was arranging the move from Aiston's account to Fracassi's account.  UFA was not told, and therefore did not know: (1) that an agent of DART, Oblyon, had an account at the NJ Warehouse, see Sotheby's SUMF ¶¶ 67, 109, 123–24; see also Rosen Reply Decl., Ex. 37; (2) that Fracassi was separately communicating with Oblyon before the transfer from New York to New Jersey even occurred to move the Artwork into Oblyon's account, see Rosen Decl., Ex. 23 at 6–9; (3) that DART intended to use the Artwork as collateral for the DART Loan, see Sotheby' SUMF ¶¶ 83, 103; (4) that Art Lending would not release any funds to DART under the DART Loan until it had "possession" of the Artwork, id. ¶ 108; or

(5) that Art Lending had its own account at the NJ Warehouse, see id. ¶ 125. UFA did not intend to deliver the Artwork to DART until it received full payment for the Artwork. See Sotheby's SUMF ¶ 136. If it had been aware of these misrepresentations, UFA would not have agreed to the transfer because such transfer was contrary to its own interests.

The undisputed record makes clear that DART all along intended to have the Artwork moved away from UFA to a location in New Jersey to provide the collateral needed to have Art Lending release the DART Loan funds. It facilitated this move through a series of maneuvers and misrepresentations to UFA and its agents, under the guise of a "viewing," until it landed the Artwork in the account of Oblyon, its agent. This was not honest in fact dealing. DART therefore did not act in "good faith" and cannot be considered a "buyer in the ordinary course of business."

### 2.    DART Knew UFA Did Not Own the Artwork.

Separately, DART also had reason to doubt UFA's ability to pay for, and UFA's ownership interest in, the Artwork. DART is itself a merchant that sought to purchase art from collectors for display on a digital platform. See Sotheby's SUMF ¶¶ 5–6, 8–9. It is therefore held to a heightened standard of good faith and should have investigated any "red flags" associated with the sale. Overton, 166 F. Supp. 3d at 401.

Here, there were two red flags present: DART "was aware of the seller's financial difficulties" and that awareness, as well as later communications, should have given DART "reason to doubt the seller's ownership of the Artwork." Id. UFA represented that it had title to the Artwork in the UFA-DART Agreement. See Rosen Decl., Ex. 2 at 3. But before that Agreement was executed, DART was made aware that UFA lacked the necessary funding to pay for the Artwork itself and that UFA would be reliant on DART to pay to complete its own purchase of the Artwork. See Sotheby's SUMF ¶ 61; Uribe Decl. ¶ 14.

Moreover, DART admitted that around the same time it made its first payment to UFA under their Agreement, it understood UFA was acting as an intermediary and not a purchaser in the overall transaction.  See 229.4 at 1 (DART representatives noting that in a September 2021 email UFA had stated it was "representing" the "collector" of the Artwork, i.e., Crippa, in the "sale of the work").  These should have been "red flags" that UFA did not have the ownership interest in the Artwork it had previously represented or the ability to purchase the Artwork itself.  But DART "proceed[ed] to purchase the artwork from [UFA] in the presence of such red flags." Overton, 166 F. Supp. 3d at 401.  For this separate reason, DART also fails to qualify as a "buyer in the ordinary course of business." Id.[11]

### C.    Each Parties' Ownership Interest in the Artwork

As of August 2021, Crippa had title to the Artwork.  See supra at 3.  She authorized Sotheby's as her agent to sell the Artwork. See id.  Sotheby's executed the Sotheby's-UFA Agreement to sell the Artwork on Crippa's behalf to UFA.  See supra at 4–5.  That Agreement explicitly stated that title would not pass from Crippa to UFA until UFA paid Sotheby's in full. See id.  UFA failed to pay Sotheby's in full.  See supra at 9.  By the plain terms of the Sotheby's-UFA Agreement, title therefore never passed to UFA.  See supra at 16–18.  Title did not otherwise pass to UFA or DART pursuant to UCC § 2-401, see supra at 18–19, or § 2-403, see supra at 21–24.  In short, neither UFA nor DART have any ownership interest in the Artwork.  Full title remains with Crippa.

Because DART never had any ownership interest in the Artwork, Art Lending likewise has no ownership interest in the Artwork.  Art Lending contends that it has a perfected security interest

---

[11] Because the Court concludes that DART was not a "buyer in the ordinary course of business" it does not reach the issue of whether there was entrustment between an owner and a merchant "who deals in goods of the kind."

in the Artwork because it has filed a UCC Statement that indicates the Artwork was provided as collateral under the DART Loan. A security interest, however, only "attaches to collateral when it becomes enforceable against the debtor." N.J.S.A. 12A:9-203(a).[12] And a security interest only becomes enforceable against "the debtor and third parties" if, inter alia, "the debtor has rights in the collateral." Id. § 12A:9-203(b)(2); see also In re Ferandos, 402 F.3d 147, 156 (3d Cir. 2005) ("It is hornbook law that the debtor can only grant a security interest in whatever rights he has in the collateral."); Matter of Emerg. Beacon Corp., 665 F.2d 36, 40 (2d Cir. 1981) ("Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence." (quotation marks omitted)). Because DART has no ownership interest in the Artwork, Art Lending did not obtain any security interest in the Artwork when it was pledged as collateral under the DART Loan.[13] Art Lending's Motion is therefore denied to the extent it seeks a decision recognizing any ownership interest in the Artwork.[14]

---

[12] The Parties have not identified an "actual conflict" between New Jersey's and New York's UCC provisions related to the enforceability and attachment of a security interest. Carrow, 2017 WL 1217119, at *4. In fact, the relevant provisions are identical, and the Parties have not identified any dispute in each state's caselaw interpreting these provisions. See N.J.S.A. 12A:9-203 (2024); N.Y. U.C.C. § 9-203 (2024). Therefore, the Court applies New Jersey law to its resolution of this issue. See Carrow, 2017 WL 1217119, at *4.

[13] Art Lending separately contends that it should not be subject to the title-retention provisions in the different agreements because it was not a party to them and it was not aware of these private transactions. See Art Lending Opp. at 10–11. But Art Lending's argument ignores that private transactions for art are common because "confidentiality is 'paramount' in the art world," Athena, 790 F. Supp. 3d at 285—a fact Art Lending does not dispute, see Sotheby's SUMF ¶ 34. It also rests on a non-sensical proposition: that the transfer of title in a good between parties is immaterial to later purchasers or lenders. Accepting that proposition would undercut the "general principle that one cannot encumber another's property," a principle that UCC § 9-203(b)(2) is specifically designed to advance. United States v. Mann, 729 F. Supp. 3d 257, 268 (N.D.N.Y. 2024) (quotation marks omitted).

[14] Sotheby's separately argues that although Crippa is the true owner of the Artwork, it nonetheless possesses a separate, independent interest or lien in the Artwork based on the $500,000 commission UFA owes it under the UFA-Sotheby's Agreement. It claims to be entitled to this amount "from any sale of" the Artwork, apparently at any future date. But Sotheby's argument is misplaced for two reasons.

### D.    Crippa's Claim for Replevin

Having determined who maintains good title to, and is therefore the owner of, the Artwork, the Court proceeds to consider Crippa's claim for replevin.  Under New Jersey law, an action for replevin may be brought by a "person seeking recovery of goods wrongly held by another." N.J.S.A. 2B:50-1 (2024).[15]  To succeed on this claim, "the burden is on plaintiff to establish absolute ownership and right to the possession of the property."  Christie v. Nat'l Institute for Newman Studies, No. 16-6572, 2019 WL 1916204, at *16 (D.N.J. Apr. 30, 2019).  More specifically, the plaintiff must show an "exclusive right to possession" at the "time of the commencement of the action."  Id. (quotation marks omitted).  "The right of possession follows the title" to the good.  Peele Co. v. Industrial Plant Corp., 200 A. 1007, 1009 (N.J. 1938).  If the

---

First, any commission Sotheby's may have had a right to under its agreements with Crippa and UFA was dependent upon completing the sale of the Artwork pursuant to those agreements.  No Party has requested, and the Court is not ordering, a sale of the Artwork pursuant to those agreements.  Therefore, Sotheby's has not completed the performance required under the agreements to obtain its commission.

Second, to obtain a lien for the compensation it claims to be owed, Sotheby's would first need to obtain a monetary judgment against the owner of the Artwork.  See Diajewels of NY, Inc. v. Great Jewel Factory, Inc., No. A-1991-19, 2021 WL 2026935, at *5 (N.J. Super. Ct. App. Div. May 21, 2021) (explaining that "to establish or acquire a lien, a creditor" needs to obtain and enter "a judgment in the records of the Superior Court" (quotation marks omitted)); Giabu v. Klein, 747 A.2d 316, 318 (N.J. Super. Ct. App. Div. 2000) (explaining that a lien can only be imposed on property "held by the judgment debtor" (quotation marks omitted)).  Sotheby's has not brought any claims in this action against either Crippa or UFA.  And even if it had brought claims against UFA or obtained a judgment against UFA, UFA has no ownership interest in the Artwork.  Therefore, Sotheby's could not impose a lien on the Artwork to fulfill a judgment against UFA.  Its motion is therefore denied to the extent it seeks a decision recognizing an independent interest or lien in the Artwork.

[15] The Parties have not identified an "actual conflict" between New Jersey's and New York's laws regarding replevin. Carrow, 2017 WL 1217119, at *4.  The standard in each state is substantively the same.  Compare Christie, 2019 WL 1916204, at *16 (explaining a claim for replevin under New Jersey law requires showing (1) "absolute ownership" and (2) an "exclusive right to possession" at the start of the action) with Int'l Bus. Machines Corp. v. BGC Partners, Inc., No. 10-128, 2013 WL 1775367, at *9 (S.D.N.Y. Apr. 25, 2013) (explaining a claim for replevin under New York law requires showing (1) "that plaintiff has a possessory right superior to that of the defendant," and (2) "that plaintiff is entitled to the immediate possession of that property").  Therefore, the Court applies New Jersey law to its resolution of this issue.  See Carrow, 2017 WL 1217119, at *4.

Court determines that the plaintiff's claim is meritorious, it may "prior to final judgment, grant possession of the goods to the plaintiff." N.J.S.A. 2B:50-2(a) (2024).

Here, Crippa had absolute ownership of the Artwork before the multi-step sale of the Artwork was negotiated. Following her 2015 divorce, she received full title and rights to the Artwork. See Crippa SUMF ¶¶ 3, 5–8; Sotheby's SUMF ¶ 21. And her title to the Artwork did not transfer pursuant to the at-issue agreements or UCC §§ 2-401 or 2-403.

Crippa's right of possession follows the fact that she has title to the Artwork. See Peele, 200 A. at 1009. Art Lending, however, challenges that Crippa's right of possession was not "exclusive" because she relinquished possession of the Artwork to Sotheby's. Art Lending's argument appears to be based on its consistent misconception about the nature of Crippa and Sotheby's relationship. Crippa retained Sotheby's as her agent to pursue a sale of the Artwork. See supra at 16 n.10. Sotheby's, therefore, was retained to act on Crippa's behalf—and it could only act as authorized. Id. The Crippa-Sotheby's Agreement is explicit that Sotheby's could only loan the Artwork to any potential buyer. See Sotheby's SUMF ¶ 41. She did not authorize Sotheby's to otherwise transfer the Artwork under any other circumstances. See generally Crippa Decl., Ex. 3.

Sotheby's acted within the scope of its authority and only transferred the Artwork to UFA under the terms of a "temporary loan." See Sotheby's SUMF ¶¶ 49. UFA also agreed that it would not move the Artwork from the NY Warehouse while held on "loan." See id. ¶ 51. That UFA violated the terms of the UFA-Sotheby's Agreement and engaged in an unauthorized transfer of the Artwork to the NJ Warehouse, where the Artwork was further subjected to multiple unauthorized transfers before making its way to Art Lending's account, does not undermine Crippa's right to exclusively possess the Artwork. Sotheby's, acting on Crippa's behalf, never

relinquished Crippa's exclusive possession of the Artwork to UFA.  UFA's unauthorized actions cannot transform the limited, temporary nature of the transfer Crippa authorized into a voluntary relinquishment of exclusive possession.

In short, Crippa has established that she has absolute ownership and an exclusive right of possession over the Artwork.  Replevin is therefore appropriate.

## V.    CONCLUSION

For the foregoing reasons, Crippa's Motion for Summary Judgment, ECF No. 225, is **GRANTED**; Sotheby's Motion for Summary Judgment, ECF No. 241, is **GRANTED in part** and **DENIED in part**; Art Lending's Motion for Summary Judgment, ECF No. 238, is **GRANTED in part** and **DENIED in part**; and Art Lending's Motion in limine, ECF No. 238, is **DENIED**. Sotheby's Complaint in Intervention, ECF No. 148, is **DISMISSED in part**.

Crippa has full title to, and ownership of, the Artwork.  She is therefore entitled to replevin of the Artwork.

No other parties have any interest in, or ownership right to, the Artwork.  To the extent Sotheby's Motion for a declaratory judgment is consistent with this conclusion, its Motion is granted.  Sotheby's Motion is otherwise denied.  To the extent Art Lending's Motion seeks dismissal of Sotheby's claims that have been rejected by the Court, its Motion is granted.  Art Lending's Motion is otherwise denied.

An appropriate Order will follow the entry of this Opinion.


Date: December 19, 2025                    *s/ Madeline Cox Arleo*
                                           **MADELINE COX ARLEO**
                                           **UNITED STATES DISTRICT JUDGE**